RIMM, J. T. C.
The City of Atlantic City sought a revision of the 1980 Atlantic County Equalization Table, asking the court to reduce the city’s portion of the county’s tax revenues by: (1) assigning to it a ratio and' aggregate true value different from those assigned to it by the Atlantic County Board of Taxation in the 1980 Atlantic County Equalization Table; (2) recalculating the ratios and aggregate true values in the table for Hamilton Township, Margate City and Somers Point City; and (3) declaring the table null and void and promulgating a new table.
The 1980 equalization table for Atlantic County, certified by the Commissioners of the County Board of Taxation on March 7, 1980, disclosed the following information for the taxing district of Atlantic City:
(a) (b) (c) (d)
Aggregate Assessed Value (Taxable Value)
Real Property Ratio of Aggregate Assessed to Aggregate True Value
Aggregate True Value
Amount by Which Taxable Value Should Be Increased To Correspond To Aggregate True Value
$847,844,900
69.09%
$1,227,160,081
$379,315,181
The city contended that the proper ratio was 80.71% and that the proper true value was $1,050,496,932 based on its expert’s analysis of the real property ratio of aggregate assessed to aggregate true value. His conclusion was that the only fair way to treat the city in the 1980 equalization table was to use the page 8 formula described in Willingboro Tp. v. Burlington Cty. Bd. of Tax., 62 N.J. 203, 300 A.2d 129 (1973) which is used for determining the aggregate true value of revalued or reassessed districts.
The equalization table is used to accomplish the Legislature’s intention of fairly distributing the cost of county *35 government among all municipalities in the county. The courts recognize that in accomplishing the legislative intent a county board may use any reasonable and efficient method. In a challenge to an equalization table the ordinary presumption of validity which accompanies a determination by a county tax board applies. Kearny v. Div. of Tax App., 35 N.J. 299, 305, 173 A.2d 8 (1961). The burden of proof on the complaining municipality is a heavy one. It must offer adequate evidence that the ratio ascribed to it is incorrect or plainly unjust and that there has been imposed on the municipality a “dramatically or substantially excessive” share of the county tax burden. Willingboro Tp. v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 220, 300 A. 129. Kearny v. Div. of Tax App., supra, 35 N.J. at 304, 173 A.2d 8.
To meet this burden of proof, the President of the Board of Assessors of Atlantic City testified that in the years prior to 1979 the assessing procedure in Atlantic City was to take the prior year’s tax ratable figures, subtract losses for the year in question and add new ratables that had been “picked up” during the course of the pretax year. This procedure was called the “normal” procedure by the assessor. For the tax year 1979, however, a different program was developed by the Board of Assessors. That year was the “first year of a four-year program to bring about a total revaluation of the ratable base.” Reassessing the city was to be done in four phases: a different area of the city was to be “reassessed” for each year from 1979 through 1982. The purpose of the program was “to follow the market.” The studies made by the Board of Assessors for the program indicated that the area zoned for casinos and the “prime residential areas” were under-assessed because of the impact of the casino industry on values in those areas. “The market indicated the areas which needed to be changed.” Determining which properties were to have their assessments changed for 1980 was a function of the marketplace and of the constant monitoring of sales. The assessor said, “The market told me where to go and how much to reassess what specific areas.” He also said that the purpose of the program was “to *36 revise the assessed valuations to more fairly reflect market value as the market developed.” The procedure used in following the market was to “monitor the sales data flow that comes in on a daily basis to the assessor’s office.” The data consisted of the abstracts of deeds received from the county clerk’s office. The abstracts were then “processed” by breakdown on a neighborhood basis throughout the entire city.
There was no sufficient and competent evidence of the manner in which the market was followed. There was: no production of records of sales; no indication of the number of sales reviewed; no indication of the specific location of properties used; no reference to the nature of the sales data or whether such sales would be “usable sales”; no indication of the consideration given, if any, to the terms of such sales; no reference to the specific period of time covered for each phase; and no explanation of how the assessor determined in 1978 that four years would be necessary if he was following the market as it developed. The assessor stated that he compared assessments with sales information for certain areas in the city, using small numbers of sales. No such studies were presented to the court, and the court is unable to evaluate the validity or effectiveness of the method used by the assessor. One of the reasons for not reassessing the entire city at one time was that the market for properties in the inlet area was “chaotic.” The assessor claimed he could not come up “with sound documentation for values in that area.” Specifically, the assessor said buyers were willing to pay high prices, but sellers were taking properties off the market in the inlet area. However, the assessor’s testimony indicated that there was sales information for the inlet.
There were no records presented to the court which demonstrated the assessing methods used. The assessor stated that he was familiar with properties in the area covered by Phase I of the program because he had been the assessor “over the course of the years” and he had a good “working knowledge” of the properties in the city. For 1979, revisions in assessments were based on market data, the assessor’s familiari *37 ty with the area and his inspections of some of the properties as a result of tax appeals over the prior three years. On cross examination by the Deputy Attorney General, the assessor testified that inspections were not made of each property whose assessments were revised. Exterior inspections were made and if the assessor saw any abnormal condition, he would make a note of it. There was no indication that proper assessment practices were followed or on what basis changes were made. There was no reference to line items or the methods used to assess the properties represented by the line items. A comparison sales approach, or market data approach, is only as good as the inspections made to determine the comparability between the property to be assessed and the comparable sale. For 1980, a similar method was used, except that another assessor was also involved and assisted the witness. Again, most of the properties whose assessments were revised were not inspected. Property record cards were referred to but not one card was produced during the trial to show what the assessors did. When questioned specifically about his valuation methods, the assessor stated that he used the land and building residual techniques. The use of the land residual technique to determine land value requires that the building value be “reliably estimated.” The use of the building residual technique presupposes “a separate land value.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate, 115, 407 (7th ed. 1978). No evidence was presented that the assessor correctly determined building values when he used the land residual technique or that he correctly determined land values when he used the building residual techniques. The entire testimony provided “no reliable guide either for a determination of the true value of the real property ratables or of the percentage of assessment to the true value thereof.” Carteret v. Div. of Tax App., 40 N.J.Super. 439, 453, 123 A.2d 559 (App.Div.1956) certif. den. 22 N.J. 224, 125 A.2d 235 (1956).
The assessor claimed the assessments for 1980 were part of a reassessment program. Although no formal rules have been adopted for the conduct of a reassessment program, certain *38 standards have been suggested for assessing practices. Local Property and Public Utility Branch, Division of Taxation, Department of the Treasury, I Real Property Appraisal Manual for New Jersey Assessors, 5-15, 31, 43, 63-65,101,115 (3d ed. 1978). When the suggested standards are ignored, the results of a reassessment program become suspect and subject to close scrutiny to determine whether it has achieved the desired results. Cedar Grove Tp. v. Essex Cty. Bd. of Tax., unreported opinion of Div. of Tax App., affirmed in an unreported opinion of the Superior Court, Appellate Division, certif. den. 47 N.J. 424, 221 A.2d 224 (1966). In any event, following a letter of June 9,1978 from the assessor to the county board of taxation by which he notified it of his four-phase program, the board ordered the city on November 15, 1978 to have a revaluation performed by independent appraisers thereby in effect rejecting the assessor’s program. The court takes judicial notice of the order. It is the subject of other litigation now pending before the court involving the city and the county board. In re Breckwoldt, 22 N.J. 271, 275, 125 A.2d 721 (1956); In re Bessemer Trust Co., 147 N.J.Super. 331, 398, 371 A.2d 316 (Ch.Div.1976) aff’d 165 N.J.Super. 76, 397 A.2d 708 (App.Div.1979); McCormick, Evidence § 330 at 765-766 (1972).
The city also claims that the manner in which the assessor treated individual line items is not important. It claims that the only consideration is the total increase in the ratable base. This is not so. While an equalization table does not affect individual assessments, Willingboro Tp. v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 208, 300 A.2d 129; Carteret v. Div. of Tax App., supra, 40 N.J.Super. at 447, 123 A.2d 559, a municipality’s allegation of improper treatment by a county board of taxation is proved by reference to specific individual assessments or line items or by reference to specific individual sales allegedly improperly included in the sales ratio study or improperly excluded or improperly regarded by the county board. Kingsley v. Div. of Tax App., 40 N.J. 338, 192 A.2d 561 (1963); Kearny v. Div. of Tax App., supra; East Windsor Tp. v. Div. of Tax App., 89 N.J.Super. 282, 214 A.2d 708 (App.Div.1965). In Willingboro Tp. *39 v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 214 n.8, 300 A.2d 129 the standard for considering the method of treating a municipality was stated as the number of line items significantly changed. At the time of Willingboro, the State Local Property Tax Bureau classified districts as revalued (by an outside appraiser) or reassessed (by the municipal assessor) when over 80% of the line items had been significantly changed in one year. The Assistant Superintendent of the Local Property and Public Utility Branch testified in the present case that the Division of Taxation now classifies districts as revalued or reassessed when at least 80% of the line items are reviewed and approximately 50% of the line items are revised, as a minimum. The assessor’s testimony was that there are approximately 13,700 taxable line items and 1,500 exempt line items, or a total of approximately 15,200 line items in the assessment records of the city. For the tax year 1980, 2,817 line items, or 18.5% of the line items in the city were revised. There was no evidence of the total number of line items reviewed.
The city called as its expert a doctor of philosophy in mathematics. He referred to the “Hart memorandum” admitted in evidence as a joint exhibit. That is a letter dated July 30, 1970, from Alan F. Hart, then State Supervisor, Local Property Tax Bureau, to the secretary of each county board of taxation, all municipal assessors and all municipal clerks. The letter transmitted an outline of the procedure followed by the Director of the Division of Taxation in the preparation of the 1970 Table of Equalized Valuations for use by the Commissioner of Education in the calculation and distribution of state school aid. The same procedure is still used. Attached to the letter is a “sample computation district average weighted ratio — 1970 table of equalized valuations.” From the memorandum the witness testified that R = CA/TV where R is the director’s ratio, CA is the value of the current assessments and TV is the true value of real property as determined from the sales study conducted by the director. He said that algebraically the formula may also be expressed as TV = CA/R. This is the form of the formula which the witness said must be used in the county equalization process *40 with TV being the true value from the director’s table from October 1 carried forward to the following March when the county table is finalized. The true value is fixed, according to the witness, for the taxing district by the director’s table. He said that, although it is an “historical true value,” it is not to be changed until the next director’s study. Accordingly, he said, since the assessor changed assessments and since true value is a constant, the ratio changes. The proper way to reflect this in the county equalization table, the witness said, is to use the page 8 formula with appropriate adjustments to the true value for added and omitted assessments and other additions and for losses of assessed ratables. Therefore, since the true value in Atlantic City was $931,651,339 in the director’s table of equalized valuations as of October 1, 1979, and since the assessor changed some assessments for the tax year 1980, the ratio for Atlantic City in the county equalization table must be 80.71%. This procedure is urged notwithstanding the fact that only 18.5% of the line items in the taxing district were changed for the 1980 assessment roll.
While the expert’s algebra is correct, he is wrong on the law. The computation of the director’s ratio as of October 1 of each year is the basis for the allocation of state school aid. N.J.S.A. 54:1-35.1, Table of equalized valuations; promulgations; place to be kept, requires the Director of the Division of Taxation to promulgate a table of equalized valuations on or before October 1 of each year for distributions pursuant to the State School Aid Act of 1954, now the Public School Education Act of 1975, N.J.S.A. 18A:7A-1 et seq. The formula used by the Director of the Division of Taxation was developed with the hope that a fair, equitable and reasonably realistic distribution of state school aid would result, notwithstanding the acknowledged failure of assessors throughout the state to assess at 100% of true value as mandated by the Legislature and the courts. In preparing the ratios for school aid, the director follows a convenient and uncomplicated system. He studies sales of real estate in each municipality. The ratio of assessments to true value is then determined by comparison between the sales prices and the *41 assessed values. The process is refined by classification and averaging, and an overall average ratio is calculated. The application of the ratio to the total assessed value of real property in the municipality produces the aggregate equalized value of such property. This equalized value is “hypothetically the true value.” Kingsley v. Div. of Tax App., supra, 40 N.J. at 341, 192 A.2d 561. It is not a constant for subsequent use as described by the expert.
Distinct from the legislative direction to the Director of the Division of Taxation with regard to state school aid is the legislative mandate to each county to develop an equalization table establishing the true value of each municipality’s real estate. N.J.S.A. 54:3-17, 18. The purpose of these computations is to achieve a fair, equitable and reasonably realistic distribution of the county tax burden to each municipality, since the county lacks taxing powers. N.J.S.A. 40A:4-12; N.J.S.A. 54:4-41, 48.
The purposes and effects of the director’s table and the county table are different. Cherry Hill Tp. v. Dir., Div. of Tax., 119 N.J.Super. 256, 260, 291 A.2d 28 (App.Div.1972). However, under well-warranted encouragement by the Division of Taxation and the courts, most county boards of taxation use the director’s school aid ratios of the previous October 1 as guides when establishing equalization tables in March of each year. Willingboro Tp. v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 209, 300 A.2d 129; East Windsor Tp. v. Div. of Tax App., supra, 89 N.J.Super. at 286, 214 A.2d 708. While the courts have consistently approved the use of the director’s ratio as a tool in the county equalization process, nowhere in the law is there a directive that the true value calculated by the director for state school aid purposes be used as the starting point for the promulgation of a county equalization table. On the contrary, the use of the director’s ratio in the county equalization process is recognized as an attempt to achieve fair distribution of the county tax burden. It is acknowledged to be an imperfect tool. When the use of the director’s ratio is shown to be improper or when its use involves an inequitable result, the director’s ratio *42 may be disregarded or modified so that fair distribution of the county tax burden will be achieved.
The director’s ratio is used when there has been no general revaluation or reassessment of the district in the current tax year. Willingboro Tp. v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 213, 300 A.2d 129. The page 8 formula is used if the taxing district has been revalued or reassessed. Little Falls Tp. v. Passaic Cty. Bd. of Tax., 139 N.J.Super. 170, 353 A.2d 120 (App.Div.1976) certif. den. 71 N.J. 345, 364 A.2d 1077 (1976); Trenton v. Mercer Cty. Bd. of Tax., 127 N.J.Super. 588, 318 A.2d 442 (App.Div.1974) modified 66 N.J. 470, 333 A.2d i (1975). The page 8 formula was designed “to avoid the disproportionate effect in revalued districts ... of dividing the new assessments by the Director’s ratio” which “would cause a gross distortion in the ... relative equalized values of such districts.” Willingboro Tp. v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 211, 222, 300 A.2d 129.
If, as the witness suggested, the page 8 formula should be applied to Atlantic City, uniform treatment of all taxing districts in the promulgation of the county equalization table would require the use of the page 8 formula for all non-revalued districts. Boro. of Sayreville v. Middlesex Cty. Bd. of Tax., 133 N.J.Super. 46, 335 A.2d 75 (App.Div.1975). The witness did not show that uniform application of the page 8 formula to all non-revalued districts would change the city’s relative share of the county tax burden. In other words the expert would treat Atlantic City differently from the other 22 municipalities in the county; or, if he would treat all the municipalities uniformly he did not show that such treatment would impose a different relative share of the county tax burden on the city.
The expert’s testimony is the pronouncement of an abstract algebraic proposition. The judiciary and fact-finding bodies are not bound by the opinions of expert witnesses. Wright v. Purepac Corp., 82 N.J.Super. 100, 111, 196 A.2d 695 (Cty.Ct.1963). The weight to be given to an expert’s opinion depends especially upon the facts and reasoning which are *43 offered as the foundation of his opinion. Ocean Cty. v. Landolfo, 132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975). The weight and value of expert testimony are for the trier of the facts. Robbins v. Thies, 117 N.J.L. 389, 398, 189 A. 67 (E. & A. 1937). An expert’s opinion may be adopted in whole or in part or completely rejected. Middlesex Cty. v. Clearwater Village, Inc., 163 N.J.Super. 166, 174, 394 A.2d 390 (App.Div.1978) certif. den. 79 N.J. 483, 401 A.2d 239 (1979). In view of the law on the page 8 formula in Little Falls Tp. v. Passaic Cty. Bd. of Tax., supra, and Trenton v. Mercer Cty. Bd. of Tax., supra, and the facts of this case brought out in the testimony of the city’s assessor, the expert’s opinion is given no weight. The court concludes that revising 18.5% of the line items was not a reassessment, and application of the page 8 formula to Atlantic City in connection with the 1980 county equalization table is not warranted.
Since the last revaluation of the city was in 1962; since assessments established then were essentially carried forward year after year; and since there was no annual maintenance of assessments after the four-year program was initiated despite an acknowledged surging real estate market, the results for 1980 were some assessments in Atlantic City at 1962 levels, some at 1979 levels and some at 1980 levels. In the face of such a pattern of assessments, the city should not be heard to complain about the county board’s use of the director’s ratio for Atlantic City in formulating its equalization table.
Atlantic City is unique. Of all the 567 municipalities in the State of New Jersey, it is the only municipality mentioned by name in the State Constitution. N.J.Const. (1947) Art. IV, § VII, par. 2D. The financial well-being of the city is also of the utmost importance not only to the city itself and to its taxpayers, but to the county, the region and to the entire State. For these reasons and because of the unusual four-phase procedure initiated by the city, the court, following completion of the trial, directed the city to supply the 1980 total assessment, by lot and block number, for each sale from the period of July 1, 1978 to June 30,1979 used by the Director of the Division of Taxation in *44 determining the director’s ratio as of October 1, 1979. The county board was directed to supply the director’s ratio as of October 1, 1980 for the 23 municipalities of Atlantic County. While the information relating to assessments was available to the county board at the time of the promulgation of the equalization table, the county board did not have the October 1 director’s ratio for the year in which the equalization table was promulgated. The court also would not have that information available by the September 10 deadline in the statute, N.J.S.A. 54:2-37, but the court extended the time for its determination. Jersey City v. St. Bd. of Tax App., 133 N.J.L. 202, 43 A.2d 799 (Sup.Ct.1945) modified sub nom. Jersey City v. Kelly, 134 N.J.L. 239, 47 A.2d 354 (E. & A. 1946) and Howell Tp. v. Div. of Tax App., 99 N.J.Super. 11, 238 A.2d 476 (App.Div.1968) certif. den. 51 N.J. 394, 241 A.2d 12 (1968).
Of the items in the 1979 study, 46 assessments were changed for 1980. When comparing the changed assessments with the sales data contained in the study for the October 1, 1979 director’s ratio, the ratios of assessments to true value had a range of 25% to 756%. The median ratio was 60.5% and the mode ratio was 59%. The mean was rejected as a valid indication of central tendency because of the aberration of one ratio of 756%. For October 1, 1980, the director’s ratio was 45.48%. These results are a “rather portentous showing,” Carteret v. Div. of Tax App., supra, 40 N.J.Super. at 462, 123 A.2d 559; do not indicate a “following of the market”; and are corroborative of the court’s conclusion that the page 8 formula should not be applied to Atlantic City in connection with the 1980 county equalization table.
During the presentation of the city’s case, there was no testimony relating to the ratios and aggregate true values in the table for Hamilton Township, Margate City and Somers Point City. At the conclusion of the city’s case, counsel for the city withdrew its claims against Hamilton Township and Somers Point City but argued that relief should be granted against Margate City on the face of the table solely by virtue of the ratio assigned to Margate City. No authority for such a conten *45 tion was cited. Since no evidence at all was presented bearing on the issue, the court cannot distinguish between the claim of the city against Hamilton Township and Somers Point City and the claim against Margate City. There was no roof of lack of uniformity on the part of the county board of taxation in using either the director’s ratio or the page 8 formula. The claim against Margate City was dismissed at the conclusion of the city’s case. Boro. of Sayreville v. Middlesex Cty. Bd. of Tax., supra, 133 N.J.Super. at 50, 335 A.2d 75.
Atlantic City has not shown that the procedure used by the Atlantic County Board of Taxation for the 1980 table of equalization is inequitable or unfair or imposes an extraordinary burden on the city. There are no facts from which this court can find that Atlantic City is paying a greater share of the county tax burden than it should. There is no sound basis establishing error to warrant invalidation of the table. Carteret v. Div. of Tax App., supra, 40 N.J.Super. at 453, 123 A.2d 559.
Although equalization is a statutory method for achieving equality in the distribution of the county tax burden, it has the effect of achieving intra- as well as inter-municipality fairness and equality in assessing. The purpose of equalization is to minimize unfair distribution of the county tax burden “in spite of divergences in the original assessment practices” and “to avoid the debased values which are produced through competitive under-assessment or for other reasons.” “ ‘[T]rue parity of the aggregates of the several municipalities cannot really be achieved without elimination of the inequities among individual assessments within all municipalities in the county.’... [Equalization between individual assessments within the taxing district is the heart of the real estate taxation problem.” Carteret v. Div. of Tax App., supra, at 448, 465, 123 A.2d 559. The refusal to set aside the equalization table may “well quicken the official conscience and induce the district to revalue [already ordered by this court] and to keep the rolls current.” In re Appeals of Kents 2124 Atlantic Ave., Inc., 34 N.J. 21, 32, 166 A.2d 763 (1961) [emphasis supplied]. The court hopes that the *46 result here will “excite the assessor [and the city] to proper performance.” Id. at 33, 166 A.2d 763.
The often repeated claim by the assessor that the situation in the inlet was so chaotic that he arbitrarily concluded not to revise assessments in that area was an unsubstantiated conclusion at best and, at worst, an indictment of the assessor’s office for failing to carry out its duties. Such an indictment arises not from a lack of “accuracy of judgment and good faith of the assessors," Willingboro Tp. v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 226, 300 A.2d 129, but by reason of the city’s failure to give the Board of Assessors sufficient help and equipment to perform its. duties properly. The assessor’s office was not staffed nor equipped to handle the information it received and had available to it. Additionally, in spite of the assessor’s reference to zoning maps and his alleged following of the" market, his determination in 1978 to revise assessments over a four-year period and his adhering to that program for 1979 and 1980 without regard to subsequent changes in the market were improper. These results also were not a function of the assessor’s lack of ability but of the city’s failure to properly staff, fund and equip his office. If, as the assessor said, he followed the market, there was no reason for not having an annual reassessment, except, of course, for the problems of help and equipment. These problems are probably some of the “other reasons” referred to when it was said that equalization is designed to avoid debased values produced by competitive under-assessment “or for other reasons.” Carteret v. Div. of Tax App., supra, 40 N.J.Super. at 465, 123 A.2d 559.
The court adds that it implies no opinion concerning any individual assessment. The propriety of an individual assessment is determined on the merits if the matter is presented to the proper forum. Cf. Willingboro Tp. v. Burlington Cty. Bd. of Tax., supra, 62 N.J. at 206 n, 300 A.2d 129. (The court implied no opinion on the merits of a matter not actually before it.)
Judgment will be entered affirming the 1980 Atlantic County equalization table.