CITY OF TRENTON, A MUNICIPAL CORPORATION OF NEW JERSEY, APPELLANT, v. MERCER COUNTY BOARD OF TAXATION AND THE DIVISION OF TAX APPEALS, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued January 14, 1974—Decided April 10, 1974.

Before Judges LEONARD, ALLCORN and CRAHAY.

· *Mr. George T. Dougherty* argued the causes for the appellant (*Mr. Robert A. Gladstone,* attorney).

*Mr. Richard H. Saxe,* Deputy Attorney General, argued the causes for the respondent (*Mr. George F. Kugler, Jr.,* Attorney General, attorney).

The opinion of the court was delivered by

ALLCORN, J. A. D. In these consolidated appeals the City of Trenton challenges the validity of both the 1972 and 1973 equalization tables prepared and confirmed by the Mercer County Board of Taxation.

Initially, we find no merit to the contention of the city that the use by the county board of the ratios determined and fixed by the Director of the Division of Taxation for the comparable periods for the distribution of school aid was improper because the Director's ratios were based on "multi-year" averaging of sales. *Newark v. Essex Cty. Bd. Taxation,* 124 *N. J. Super.* 76, 80 (App. Div. 1973), certif. den. 63 *N. J.* 566 (1973).

The city next contends that the Director's tables for both years were further infected because the sales data used in the calculation of his ratios for Trenton included current year sales of residential properties which were F.H.A.-financed.

The same argument was made below. It was rejected by the Division on the appeal of the 1972 table; but on the appeal of the 1973 table the Division determined that certain specified current sales that were F.H.A.-financed should be eliminated, and directed the table to be revised by recalculating Trenton's ratio omitting said sales — the case of *Newark v. Essex Cty. Bd. Taxation, supra,* having been decided subsequent to the Division decision on the 1972 table, but prior to its decision on the 1973 table.

There would appear to be little question but that, in the sale and purchase of residential properties which are financed by loans guaranteed by F.H.A. there frequently are imposed as conditions to the sale and to the grant of the loan various extraordinary charges such as points to the lender, purchaser's closing costs, etc., payable in whole or substantial part by the seller.[1] Such extraordinary charges necessarily reduce the net amount received by the seller on account of the stated price and, *pro tanto,* the market value of the property. And, assuming that no such extraordinary charges are laid on the seller in non-F.H.A.-financed sales, then the use of the F.H.A.-financed sales at their stated or contract prices in the calculation of the ratio between assessed values and sales prices necessarily results in something less than a true and accurate ratio.

Given these circumstances, the appropriate remedy in the present cases is difficult both of conception and of design. Should F.H.A.-financed sales of residential properties be excluded in computing the current year sales ratio? If so, should *all* such sales be excluded without regard to the existence and proportion of the extraordinary charges, or only those sales in which the extraordinary charges exceed a fixed, arbitrary percentage of the stated purchase price? Or, should F.H.A.-financed sales of residential properties be included in computing the current year sales ratio — all at the stated contract price, except those sales as to which the affected mu-

---

[1] And, occasionally, in part by the broker.

nicipalities establish the fact and the amount of extraordinary charges borne by the sellers, in which cases the stated contract prices would be reduced accordingly and included in the computation as so adjusted.

Simplistically, accuracy best could be achieved by a complete exclusion of all F.H.A.-financed residential sales. The adoption of this course would have the advantage of eliminating the need for the affected municipalities to search out and compile the various data relating to the extraordinary charges in each sale. Questions of reliability of such data aside, the difficulties encountered and the time and effort expended in acquiring it are considerable. And the measure of success would be something less than satisfactory. The inability of the city here to obtain such data for any more than 56 out of a total of 159 such sales speaks for itself. Notwithstanding the advantages cited, however, there has been expressed an understandable concern, not unfounded, that if all F.H.A.-financed sales were to be excluded, there might well be an insufficient number of usable sales remaining in some communities to form a dependable base on which to determine a reliable ratio.

In the consideration of partial exclusion rather than total exclusion as the purgative, we are faced at the outset with the question of what the determinant shall be. Should all sales in which the payment of seller-borne extraordinary charges is established be excluded, without regard to the proportion they bear to the stated sales prices? Or should there be excluded only those sales in which the extraordinary charges constitute a substantial or significant percentage of the stated sales prices — and, if so, where is the line to be drawn?[2]

Quite obviously, there is no uniformity in the amounts or the proportions of the extraordinary charges imposed. No better evidence of this can be had than the proofs submitted by the city in its challenge to the 1972 table. As earlier in-

---

[2]Compare, *Newark v. Essex Cty. Bd. Taxation, supra.*

dicated, the city introduced a list of 159 sales of F.H.A.-financed residential properties occurring in Trenton in the years 1970 and 1971. Of these 159 sales the city was able to obtain and to submit the details (street address, seller, purchase price and "financing fee") of some 56 — approximately one-third. An analysis of such data reveals that, in terms of percentage of purchase price, the "financing fee" ranged between 0% and 11.625%. In tabular form, the breakdown by whole percentage points was as follows:

| Financing Fee as Expressed in Percentage of Purchase Price | Number of Sales |
|---|---|
| 0% | 2 |
| 1.0% — 1.99% | 0 |
| 2.0% — 2.99% | 1 |
| 3.0% — 3.99% | 6 |
| 4.0% — 4.99% | 4 |
| 5.0% — 5.99% | 2 |
| 6.0% — 6.99% | 12 |
| 7.0% — 7.99% | 14 |
| 8.0% — 8.99% | 7 |
| 9.0% — 9.99% | 4 |
| 10.0% — 10.99% | 2 |
| 11.0% — 11.99% | 2 |
| | 56 |

If the foregoing is at all representative, it is at once apparent that the number of F.H.A.-financed sales in which there were no such extraordinary charges is exceedingly small — 2 out of 56, or 3.5%. Equally apparent is the fact that if the exclusionary line is drawn at any point above zero, some measure of distortion necessarily occurs. For, whether the extraordinary charges amount to 1% or 12% of the stated contract price, or some intermediate percentage, the inclusion of the sale at the stated contract price in computing the ratio between assessed value and sales price in-

troduces an inaccurate factor which, in turn, will be reflected in the ratio produced.

■ In the light of the foregoing, on balance, it would appear that the public interest would be best and most equitably served by computing the ratio between assessed value and current year sales by including all current year sales of residential properties financed by F.H.A. loans (not otherwise disqualified) at the stated contract prices — except those sales in which the taxing district establishes the fact and the amount of extraordinary charges paid by the seller, in which event the stated contract prices shall be reduced accordingly and the sales included in the computation at the prices so adjusted. By the use of such method of procedure, the number of usable sales is not diminished to any extent whatever and there is no weakening of the sales base— both principal concerns in the use of either of the exclusionary methods. At the same time the distortions that necessarily inhere in the fixing of an arbitrary point at and above which sales would be excluded and below which they would be included (without adjustment), also are entirely eliminated.

Consequently, the determinations of the Division of Tax Appeals in both of the appeals with regard to the treatment of the F.H.A. sales must be reversed, and both cases remanded so that the tax equalization table for each of the years 1972 and 1973 may be revised by the Division in accordance with the views herein set forth — after a hearing or hearings, on notice to the county tax board and to all municipalities. Elementary fairness, as well as the assurance of apportionment of the county tax burden in a manner as nearly accurate as possible, requires that at said hearings any municipality so desiring be given the opportunity to submit evidence to establish the requisite factors for the adjustment of the purchase price of any current year F.H.A. sales in the respective municipalities which were included by the Director in computing his current year ratio of assessed value to true value.

. We are satisfied also that it was improper for the county board to apply the Director's page 8 formula to all of the municipalities in computing the 1972 equalization table. The whole purpose of that formula is "to produce equalized valuations in the new tax year for revalued [or reassessed] districts which will correspond in method of determination with the equalized valuations for non-revalued [and non-reassessed] districts resulting from use of the Director's ratios as applied to such districts in the ordinary course by county boards." *Willingboro Tp. v. Burlington Cty. Bd. Tax.*, 62 *N. J.* 203, 222 (1973).

In view of the fact that two municipalities had revalued or reassessed for that year, the application of the page 8 formula to all municipalities completely defeated the purpose for which said formula was designed, and could not help but result in a distortion as between the ratios of the revalued and reassessed districts and the remaining districts. Contrary to the contention of the county board, a general increase in the level of assessed values from 50% to 100% in all Mercer County taxing districts does not constitute a reassessment within the comprehension of the page 8 formula.

Accordingly, the determinations of the Division of Tax Appeals on the appeals of the tax equalization tables promulgated and confirmed by the Mercer County Board of Taxation for each of the years 1972 and 1973 are reversed; and both causes are remanded to the Division for new hearings and redeterminations of the tax equalization tables for each of said years, consistent with this opinion. If, following said redetermination, any municipality whose proportionate share of county taxes is increased for either or both years shall make timely application therefor, the Division is authorized to direct appropriate reimbursement among the municipalities in annual installments or otherwise as may seem just.