RIMM, J. T. C.
These local property tax matters are before me on the motion of the municipality to disqualify the attorneys for taxpayers on the ground that they represented the City of Atlantic City in negligence and workers’ compensation claims and appeared as attorneys of record in the courts of this State in defense of such claims at the very times that they filed a complaint, a cross-claim and counterclaims against the city seeking reductions in the local property tax assessments on Caesar’s Boardwalk Regency Hotel and Casino property. The subject property is designated as Block 37, Lot 65, and Block 36, Lot 79. Taxpayers in all the cases, Maxwell Goldberg, Milton Neustadter, Edward Beron, Albert Toll and Joseph Toll, trading as Jemm Company, are represented by Cooper, Perskie, Katzman, April, Niedelman & Wagenheim, a professional corporation, hereafter referred to as the firm.
*198 The matter for the tax year 1979 involves an added assessment on Block 37, Lot 65, of $44,885,600, prorated for six months. On appeal to the Atlantic County Board of Taxation, the board entered a judgment reducing the added assessment to $22,428,000, prorated for six months, resulting in an assessment reduction of $11,228,800. The firm represented taxpayers before the county board of taxation. Following the entry of the judgment of the county board of taxation, the firm filed a complaint with this court on behalf of taxpayers on February 13, 1980 seeking a further reduction in the added assessment. The city filed an answer and counterclaim demanding an increase in the added assessment. The firm filed an answer to the city’s counterclaim.
For the tax year 1980 the original assessments were:
Block 36, Lot 79 Block 37, Lot 65
Land $ 1,731,900 Land $ 7,260,000
Improvements 2,772,000 Improvements 50,755,000
Total $ 4,503,900 Total $ 58,015,000.
On appeal to the Atlantic County Board of Taxation the assessments were sustained. Prior to entry of the judgments of the Atlantic County Board of Taxation, the County of Atlantic and Charles D. Worthington, County Executive of the County of Atlantic, had filed a direct appeal with the Tax Court on August 15, 1980 seeking increases in the land assessments for both lots. Subsequently, an amended complaint was filed by the county and Worthington in which they sought increases in the assessments of both the land and improvements on both lots. The firm filed an answer to the complaint and a cross-claim against the city, which had also been named a defendant in the complaint, in which cross-claim the firm sought reductions in the assessments on behalf of taxpayers. On December 16, 1980 the City of Atlantic City filed two separate complaints with the Tax Court in which it sought increases in the assessments of the two lots. In each case the firm filed an answer and counterclaim on *199 behalf of taxpayers, which counterclaims sought reductions in the assessments.
For 1981 the original assessments were:
Block 36, Lot 79 Block 37, Lot 65
Land $ 1,731,900 Land 7,260,000
Improvements 2,772,000 Improvements 38,297,400
Total $ 4,503,900 Total 45,557,400.
The City of Atlantic City filed direct appeals with the Tax Court on August 14, 1981 in which it sought increases in the assessments. The firm filed answers and counterclaims in both matters on behalf of taxpayers seeking reductions in the assessments.
Counsel for the city argues that the firm, by reason of its dealings with the city, is better able to gauge the city’s tactics and strategy in litigated matters; is more aware of the city’s financial problems and is better able to know how and when to pressure the city in settlement discussions. Succinctly stated, the municipality’s position is that an attorney may not represent a client and file a suit against that client at the same time.
Two preliminary observations are necessary. First, I have the jurisdiction and the obligation to hear the matter and to determine if taxpayers’ attorneys should be allowed to continue to represent them. DeLuca v. Kahr Bros., Inc., 171 N.J.Super. 100, 106, 407 A.2d 1285 (Law Div.1979). R. 1:1-1 specifically provides that the rules in Part 1 of the Rules Governing the Courts of the State of New Jersey are applicable to the Tax Court. R. 1:18 provides as follows:
It shall be the duty of every judge to abide by and to enforce the provisions of the Disciplinary Rules of the Code of Professional Responsibility, the Code of Judicial Conduct and the provisions of R. 1:15 and R. 1:17.
In at least two judicial pronouncements trial court judges in civil matters have ruled on motions to disqualify trial counsel. In Perazzelli v. Perazzelli, 147 N.J.Super. 53, 370 A.2d 535 (Ch.Div.1976), the trial judge terminated defendant’s trial counsel’s representation in the matter under the authority of R. 1:18, *200 referring to comments in ABA Comm. on Professional Ethics, Opinion No. 50 (1931), and N.J. Advisory Comm, on Professional Ethics, Opinion No. 233 (1972). In Reardon v. Marlayne, Inc., 163 N.J.Super. 529, 395 A.2d 255 (Law Div.1978), aff’d 167 NJ.Super. 11, 400 A.2d 490 (App.Div.1979), aff’d 83 N.J. 460, 416 A.2d 852 (1980), the trial judge removed plaintiff’s attorney completely from the matter, even in the face of a claim of violation of constitutional rights, and denied substitute counsel the use of much of the disqualified attorney’s work product.
Secondly, the determination of the motion is made in the context of the Supreme Court’s pronouncement in Reardon to the effect that
It has been noted that “the Code of Professional Responsibility is not designed for Holmes’ proverbial ‘bad man’ who wants to know just how many corners he may cut, how close to the line he may play, without running into trouble with the law.” General Motors Corp. v. City of New York, 501 F.2d 639, 649 (2 Cir. 1974) (quoting O. W. Holmes, The Path of the Law, in Collected Legal Papers 170 (1920)). Rather, “it is drawn for the ‘good man’ as a beacon to assist him in navigating an ethical course through the sometimes murky waters of professional conduct.” Id. Because an attorney’s ethical obligation may often be uncertain, reliance on the good faith of an individual attorney in all its human frailty provides an inadequate safeguard against improi>er behavior, both actual and imagined. [83 N.J. at 469, 416 A .2d 852]
In opposition to the city’s motion the firm claims that there is no specific prohibition against dual representation, and it is permitted to represent the city and to sue the city at the same time. The firm also argues that it should not be disqualified because:
1. Notwithstanding that the city was the firm’s client as was said in testimony given by one of the firm’s partners on the return day of the motion, the firm was insulated from the city because the firm dealt with ESIS, Inc., a company hired by the city to administer its self-insurance program and to investigate claims against the city, much as an insurance adjuster would do for an insurance company.
2. In the course of handling matters for the city, the firm gained no knowledge of a confidential nature which it could use against the city in suits in the Tax Court, and the firm is departmentalized: the negligence lawyers do not handle tax matters and the tax lawyers do not handle negligence matters.
*201 3. By continuing its relationship with the firm, the city expressly or impliedly consented to the firm’s filing suit against the city.
4. The firm resigned as attorney for the city after receiving the motion papers, and
5. It would be inequitable to the taxpayers to require them to obtain other counsel to handle their matters in the Tax Court.
The relevant facts are before the court in affidavits filed on behalf of and in opposition to the motion and in oral testimony taken on the return day of the motion. The affidavits and testimony disclose that on August 4, 1977 the governing body of the City of Atlantic City adopted a resolution designating the firm as counsel for the city in connection with all negligence and workers’ compensation claims made against the city. The city was then, and still is, self-insured. Since that date the firm has defended the city against such claims and has been paid legal fees and expenses incurred in connection with such representation in accordance with resolutions adopted from time to time by the board of commissioners of the city authorizing and directing payments to the city’s vendors. On June 15, 1981, for reasons apparently unrelated to these cases, the firm’s representation of the city in negligence and workers’ compensation matters was terminated as to incidents occurring after that date. However, the firm continued to represent the city in all such matters pending on June 15, 1981. All new matters involving incidents which occurred prior to June 15, 1981 were also sent to the firm for its representation of the city. On November 5, 1981, after apparently learning of the prospective filing of the present motion, the firm ceased doing all work on the city’s files. However, by agreement with the city, the files were retained by the firm pending a determination of the motion. On November 19, 1981 the firm advised the city that, having received the motion papers, it was now terminating its representation of the city, effective immediately, and was undertaking to bill all of the city’s files as soon as possible. According to the testimony of one of the partners of the firm, the firm had 103 active *202 negligence files and 203 active workers’ compensation files when it sent the files to new counsel selected by the city in November 1981. The partner who testified was in charge of negligence cases. Another partner was in charge of the workers’ compensation matters. Neither of them was involved in local property tax matters. The partner who argued the motion on behalf of the firm was in charge of local property tax matters and he did not handle negligence or compensation matters for the city. The partner who testified also indicated that if any employee in the assessor’s office filed a workers’ compensation claim against the city, his firm would represent the city in the matter. The assessor’s office employs three secretaries and three field men, and there are three assessors employed by the city who constitute the board of assessors.
The testimony also indicated that the firm dealt with the city solicitor in the handling of negligence matters, and the governing body had to approve settlements recommended in negligence cases handled by the firm. In such matters the firm submitted facts, figures and recommendations to the city solicitor, who prepared his own recommendations which were then submitted to the governing body of the city for approval. The solicitor then prepared resolutions, as necessary, embodying the commissioners’ determinations, and he advised the firm of those determinations. The solicitor also testified that he conferred once a week with one of the firm’s partners to discuss pending litigation, and copies of all pleadings and correspondence were sent to him.
The city solicitor is also involved in tax matters, even when the city uses special tax counsel. In handling substantial tax appeals the solicitor testified that he, the president of the board of assessors and special tax counsel decided which suits were to be handled by him and which suits were to be handled by special counsel. He also prepared all resolutions for the governing body involving determinations by that body to file suits against taxpayers seeking increases in assessments. The solicitor also indicated that he made the determination to settle tax matters in which he was involved for the city, and, when approvals of *203 settlements had to be obtained from the city commissioners, he prepared resolutions for the governing body’s adoption, whether he or special counsel were involved.
In connection with its representation of the city, the firm had been paid approximately $203,000, and approximately $200,000 was due to the firm from the city for which bills had not yet been sent to the city.
An attorney may not appear against a former client in the same litigation in which he previously provided representation. State v. Rizzo, 69 N.J. 28, 350 A.2d 225 (1975); In re Blatt, 42 N.J. 522, 201 A.2d 715 (1964). An attorney also may not represent an interest in new litigation adverse to the same or substantially similar interest of his former client. Reardon v. Marlayne, supra. The precise issue now before the court is whether an attorney may represent an interest in new litigation adverse to a present client on whose behalf he is defending other litigation. Complicating the issue is the fact that the first client involves the public interest.
While it is true that there is no specific disciplinary rule dealing in so many words with the question before the court, the firm errs in its position that because there is no specific prohibition against its actions, it is permitted to represent both the city and to sue it at the same time. The answer to the question before the court may not be so simplistically resolved. The standards of professional ethics are not to be so narrowly interpreted. Our profession’s ethical standards require careful consideration to determine the adverse effect of given actions on the profession and on the judicial system, and to determine the public’s perception of them. In re Blatt, supra, 42 N.J. at 524, 201 A.2d 715. Indeed, it is because the individual attorney’s responsibility is broader than the specific prohibitions in the Disciplinary Rules of the Code of Professional Responsibility, that each case must rest on a close analysis of the facts. Reardon v. Marlayne, Inc., supra.
The ethical obligations of every attorney to avoid taking unfair advantage of a client, to avoid an implication of exerting *204 improper influence and of giving complete fidelity to a client are basic to the legitimate practice of law and to the system of adversary litigation which is one cornerstone of that practice. Fulfilling these obligations will encourage an open atmosphere of trust, enabling the attorney to perform his services properly for the client. Imbedded in these obligations is the caveat of avoiding even appearances of impropriety.
The public display of an attorney representing conflicting interests, regardless of the attorney’s good faith, may prevent the prospective client from completely confiding in his attorney ... It likewise would tend to erode the public’s confidence in the bar. [Reardon v. Marlayne, Inc., supra, 83 N.J. at 470, 416 A. 2d 852]
A much more stringent test than that postulated by the Supreme Court in Reardon applies when disqualification of a lawyer is sought by a present client. Professor Hazard’s[1] proposition is sufficient:
A lawyer who represents a plaintiff cannot also represent a defendant, nor may a lawyer representing one client take on another who plans a lawsuit against the first. [Hazard, Ethics in the Practice of Law (1978), 70; emphasis supplied]
If the adversary system is to work, the lawyer must demonstrate undivided fidelity to his client in litigation. The client must be completely at ease in giving his attorney information and with having his attorney understand his deliberative processes without fear of prejudice to him in other matters.
“Developments in the Law, Conflicts of Interest in the Legal Profession,” 94 Harv.L.Rev. 1244 (1981), distinguished between “instrumental” and “intrinsic” justifications in legal ethics. Certain ethical rules require a lawyer to pursue a client’s ends and to adequately represent a client. These are the “instrumental” justifications. Other rules are considered to be intrinsically valuable. The justification for those prohibitions is based solely on a concern for the moral integrity of the client. The disposition of other client interests that are within the lawyer’s power to influence are therefore relevant. An example of a prohibition which has an intrinsic justification is as follows:
*205 Thus, when a lawyer prosecutes a suit against one of his clients in a matter unrelated to that in which he represents that client, the client-defendant may move to disqualify his lawyer from representing the plaintiff on the basis of a per se rule, despite the fact that the one client (the plaintiff) has no interest in inducing the lawyer to slacken his aid to the other, since the lawyer is aiding the other in matters of no concern to the plaintiff’s litigation, [at 1257; footnote omitted]
The act of dual representation is condemned as inherently wrong. Id. at 1259. The concept of inherence in the area of professional ethics is clear in our law. State v. Bellucci, 81 N.J. 531, 540, 410 A.2d 666 (1980); State v. Land, 73 N.J. 24, 30, 372 A.2d 297 (1977).
The Supreme Court of Errors of Connecticut has come to the same conclusion. In Grievance Comm. of Bar of Hartford Cty. v. Rottner, 152 Conn. 59, 203 A.2d 82 (1964), the court let stand a reprimand of counsel whose firm, while representing a client in a collection matter, instituted a personal injury action against the client on behalf of another client. The court said:
[A] firm may not accept any action against a person whom they are presently representing even though there is no relationship between the two cases . . . [A]n opinion of the committee on professional ethics of the New York County Lawyers’ Association ... stated in part: ‘While under the circumstances * * * there may be no actual conflict of interest * * * “maintenance of public confidence in the bar requires an attorney who has accepted representation of a client to decline, while representing such client, any employment from an adverse party in any matter even though wholly unrelated to the original retainer.” [203 A.2d at 84]
The functioning of our legal and judicial systems also depends to a large extent on the good will of the public. That is the reason for avoiding not only impropriety but also for avoiding even the appearance of impropriety.
Although the partner of the firm who testified conceded that Atlantic City was the firm’s client, the firm argues that Advisory Opinion 428 (1979) permits its actions. That opinion permits a lawyer who occasionally represents a municipality through its insurance carrier to appear before agencies of that municipality. The argument is that the firm has the same relationship with the city as insurance counsel has with an insured, because the firm represents the city under the city’s self-insurance program. This, according to the firm’s argument, permits it to sue the *206 city, because, as was said in open court by the partner presenting the argument, negligence matters are special. He said that “there is a special field of law .. . that gives you the permission as an attorney representing a municipality in these kinds of cases to appear in cases involving the city in other matters. And that’s the negligence field. It’s very special.” I reject this position. The loyalty owed to the insured by the attorney is “paramount.” Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 338, 419 A.2d 417 (1980). “A lawyer so retained is duty bound to represent the insured with undivided fidelity. His ethical obligation is in no sense diminished by reason of his relationship with the insurer.” Longo v. American Policy Holders Ins. Co., 181 N.J.Super. 87, 92, 436 A.2d 577 (Law Div.1981). “An attorney owes his client an unswerving allegiance. The fact that the attorney is assigned by an insurance company does not alter the basic lawyer-client relationship or the duty owed by lawyer to client.” Bartels v. Romano, 171 N.J.Super. 23, 29, 407 A.2d 1248 (App.Div.1979).[2]
In the present case, in view of the fact that the firm is counsel for the city in negligence and compensation cases, Advisory Comm, on Professional Ethics Opinion No. 466 (1980) is more analogous than Advisory Opinion No. 428. That opinion concluded it was improper for special labor counsel representing a municipality in labor matters only “to represent interests before (or in litigated matters against) the public entity during service as special counsel.”
While it is probably true that no specific confidential information was obtained by the lawyers handling negligence and compensation matters which would affect the tax litigation, or by the lawyers handling tax matters which would affect the *207 negligence and compensation litigation, the result here must not turn on so narrow an issue. Although no confidential information was involved in In re Kushinsky, 53 N.J. 1, 247 A.2d 665 (1968), because there were unrelated matters, the attorney was reprimanded and the court said:
While it is true that the stockholder’s action and the criminal action were unrelated to the actions of Fencecreft [sic] against Humus and Damon, the respondent was under an obligation to devote his full allegiance to his first client Fencecraft. [at 4, 247 A.2d 665]
The “obligation to devote his full allegiance to his first client” certainly would bar a lawyer from suing that client.
The firm’s argument that it is compartmentalized and that such division of labor is a safeguard for the city has no merit. The city did not hire a specific lawyer. It hired a law firm, with its total resources and its total reputation for competency, and it reposed confidence in the firm. Even though a specific lawyer may handle a specific matter, a client understands that he is represented by the lawyer’s firm and the public perceives of the firm as the client’s lawyers.
Each partner’s professional knowledge is justifiably imputed to the entire firm, regardless of actual disclosure . .. The shared economic interest of the entire firm in the clients of individual members also supjxirts treating a partnership as one attorney .. . Perhaps most importantly, public confidence in the integrity of the bar would be eroded if conduct proscribed for one lawyer could be performed by his partner. [State v. Bellucci, 81 N.J. 531, 541-542, 410 A.2d 666 (1980)]
“If one attorney in a firm is disqualified, the entire firm is precluded from representing the client in that suit.” Reardon v. Marlayne, supra, 83 N.J. at 470, 416 A.2d 852. DR5- 105(D). Such disqualification of the entire firm is not avoided by departmentalization. In Reardon the court rejected the existence of departmentalized corporate law firms as a reason for loosening ethical standards required of the profession.
The firm argues that it had the consent of both the taxpayers and the governing body to represent the city and to sue city. In oral argument the firm stated that when taxpayers sought to engage the firm to represent it in these matters, the firm made full and complete disclosure to taxpayers of its representation of the city. At the time, the firm explained to taxpayers that it *208 was the firm’s opinion that Advisory Opinion No. 428 permitted it to sue the city while at the same time representing the city. Taxpayers gave their consent to the firm’s undertaking to represent them in these matters. However, the firm never sought consent from the city and did not even extend to the city the simple courtesy, without regard to professional obligation, of making full disclosure to the city at the time it undertook to represent the taxpayers. We will never know what the city’s reaction would have been at that time. Instead, the firm argues that the consent of the city is implied in the nearly two years of ongoing litigation involving the present matters, without objection by the city to the firm’s representation of taxpayers. The firm also argues that it had sued the city in at least one other matter in regard to which the governing body must have known of its representation of an adverse interest, and yet no objection was raised. In addition, the firm claims that consent is explicit in the November 1981 agreement between the firm and city for the firm to retain the city’s files until a resolution of this motion.[3]
The firm’s arguments lack merit. Without regard to my obligation to carefully scrutinize the giving of consent in conflict matters, In re Asbestos Cases, 514 F.Supp. 914 (E.D.Va.1981), I hold that consent to a conflict of interest is “unavailable where the public interest is involved.” Drinker, Legal Ethics (1953), 120. Ahto v. Weaver, 39 N.J. 418, 431, 189 A.2d 27 (1963); In re Opinion No. 415, 81 N.J. 318, 326, 407 A.2d 1197 (1979); In re Opinion No. 452, 87 N.J. 45, 49, 432 A.2d 829 (1981).
 The fact that the firm withdrew as attorney for the city in the negligence and compensation matters does not suf *209 fice. In this instance the firm must not represent the city or taxpayers. In In re A. and R, 44 N.J. 331, 209 A.2d 101 (1965), the Supreme Court concluded on the basis of a “Notice to the Bar” that if an attorney for a municipality also represents individuals whose interests come before or are affected by it,
... the attorney has the affirmative ethical responsibility immediately and fully to disclose his conflict of interest, to withdraw completely from representing both the municipality or agency and the private client with respect to such matter, and to recommend to the municipality or agency that it retain independent counsel, [at 334, 209 A.2d 101]
While the court referred to “such matter,” I hold that complete withdrawal is the only avenue open to an attorney who files a suit against a municipality on whose behalf he is at that very time actively engaged in ongoing litigation in defense of claims asserted against the municipality. DeLuca v. Kahr Bros., Inc., 171 N.J.Super. 100, 407 A.2d 1285 (Law Div.1979); Clark v. Corliss, 98 N.J.Super. 323, 237 A.2d 298 (App.Div.1967). Although these two cases also deal with representation by an attorney in the same matter, “essential justice,” Clark v. Corliss, at 327, 237 A.2d 298, and the concern I have for avoiding even the appearance of impropriety require no less than that the firm withdraw from representing taxpayers. The higher standard of propriety imposed on the legal profession when the public interest is involved results from the fact that possible areas of conflict of interest are subject to even closer scrutiny when the public interest is involved. In re Opinion 452, supra, 87 N.J. at 50, 432 A.2d 829.
In International Business Machines Corp. v. Levin, 579 F.2d 271 (3 Cir. 1978), IBM sought to disqualify Levin’s counsel in a private antitrust suit against it. The disqualification of the law firm representing Levin was sought on the ground that the law firm had represented IBM on numerous occasions involving labor and commercial matters before and after the suit had been filed. The firm was not on retainer for IBM and the matters had no relation to the antitrust litigation. Furthermore, the firm did not obtain any information which would aid it in the prosecution of the antitrust suit against IBM and it terminated its relationship with IBM. In affirming the New Jersey Federal *210 District Court’s removal of the firm as counsel for Levin, the Circuit Court said:
... The plaintiffs’ interest in retaining counsel of its choice and the lack of prejudice to IBM resulting from CBM’s violation of professional ethics are not the only factors to be considered in this disqualification proceeding. An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public... . The maintenance of public confidence in the propriety of the conduct'of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety, [at 283]
The withdrawal here by the firm from representing the city while continuing to represent taxpayers only emphasizes the problem. It may call down on the legal profession an expression of opprobrium on the part of the public who may realistically be expected to ask why the firm did not withdraw from its representation of taxpayers and continue to represent the city until all of its matters were completed. After all, it is the informed and concerned private citizen with whose perception I am concerned. In re Opinion No. 452, supra, 87 N.J. at 50, 432 A.2d 829. In Grievance Comm. of the Bar of Hartford Cty. v. Rottner, 152 Conn. 59, 203 A.2d 82, 83 (Sup.Ct. of Err. 1964), the court, in affirming the removal of an attorney from two unrelated matters involving a conflict of interest,[4] said:
We feel that this rule should be rigidly followed by the legal profession. When a client engages the services of a lawyer in a given piece of business he is entitled to feel that, until that business is finally disposed of in some manner, he has the undivided loyalty of the one upon whom he looks as his advocate and his champion. If, as in this case, he is sued and his home attached by his own attorney, who is representing him in another matter, all feeling of loyalty is necessarily destroyed, and the profession is exposed to the charge that it is interested only in money. [203 A2A at 84]
The argument that it would be inequitable to require the taxpayers to obtain other counsel is singularly unimpressive. To the extent that equities should be considered in this matter, I am constrained to ask: what about the equities in favor of the city? What about the confidence reposed in the firm by the city when it was hired in 1977? What about additional cost to the *211 city now? As indicated, the firm intends to bill the city for all services rendered up to the time it turned the 306 active files over to new counsel for the city in November 1981. Now the city has to pay fees to new counsel to take over, review and study the files and to prepare himself to the point where the firm was at the time it resigned as counsel, clearly an unreasonable and unfair burden to impose on the city. In addition, “the right of the public to retain counsel of its choice is secondary in importance to the court’s duty to maintain the highest standards of professional conduct to insure and preserve trust in the integrity of the bar.” In re Asbestos Cases, 514 F.Supp. 914, 925 (D.C.E.D.Va.1981); IBM v. Levin, 579 F.2d 271, 283 (3 Cir. 1978).
The firm’s knowledge of the city’s attitude toward litigation, its knowledge of the solicitor’s method of handling proposed settlements, its regular contact with the city solicitor and the governing body, and the necessary repose of confidence in the firm by the city in negligence and compensation matters can only redound, in the perception of the informed and concerned private citizen, to the benefit of taxpayers in this matter and to the detriment of the city if the firm continues to represent taxpayers. Clearly DR9-101 applies to the situation before the court requiring the court to exercise vigilence to insure that there is the avoidance of even the appearance of impropriety.
My conclusion is that the firm is disqualified from representing the taxpayers. It is based, as was the court’s in Perillo, “substantially upon the appearance of ethical impropriety which, although not fully articulated in Disciplinary Rule 9-101, is nevertheless a basic ethical concept.” Perillo v. Advisory Comm. on Professional Ethics, 83 N.J. 366, 370, 416 A.2d 801 (1980).
The vantage from which such “appearance must be evaluated” is not that of the attorney involved, but rather is that of the public. In re Opinion No. 415, supra, 81 N.J. at 325 [407 A.2d 1197]; see In re Wilson, 81 N.J. 451, 456 [409 A.2d 1153] (1979). “Thus it is that sometimes an attorney, guiltless in any actual sense, nevertheless is required to stand aside for the sake of public confidence in the probity of the administration of justice.” State v. Rizzo, 69 N.J. 28, 30 [350 A.2d 225] (1975); accord, In re Opinion No. 415, supra, 81 N.J. at 323 [407 A.2d 1197]. “Integrity is the very breath of justice. Confidence in our law, our courts and in the administration of justice is our supreme interest. No practice must be permitted to prevail which invites toward the administration of justice a *212 doubt or distrust of its integrity.” Erwin M. Jennings Co. v. DiGenova, 107 Conn. 491, 499, 141 A. 866, 868 (Sup.Ct. Errors 1928). [Id. at 373, 416 A.2d 801]
The city also urges that the firm should be regarded as a municipal attorney within the definition of the New Jersey Conflicts of Interest Law, N.J.S.A. 52:13D-12 et seq. Accordingly, the city contends, the firm is prohibited from representing any casino industry related clients for a period of two years from the date of the firm’s termination of its representation of the city in November 1981. N.J.S.A. 52:13D-17.1 b. In view of the conclusion I have reached in this matter, it is not necessary for me to rule on the city’s contention. However, as pointed out in Reardon, “No discussion of the professional responsibilities which result from past relationships can be complete without consideration of the element of time.” Reardon v. Marlayne, Inc., supra, 163 NJ.Super. at 539, 395 A.2d 255. When the issue is necessarily before a court, I suggest that both the Legislature and the Supreme Court have given guidelines which should be considered even without a determination that the firm is a municipal attorney under the definition of the conflicts of interest law. The unique status of Atlantic City as a result of the casino industry has already been noted by this court. Atlantic City v. Atlantic Cty. Bd. of Tax., 2 N.J.Tax 30, 43 (Tax Ct. 1980). In addition, the Supreme Court has, in the strongest possible language, indicated its concern for the conduct of the casino industry in Atlantic City. In Knight v. Margate City, 86 N.J. 374, 431 A.2d 833 (1981), the court said:
Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the constitution itself. N.J. Constitution (1947), Article 4, Section 7, par. 2. As expressed in the Casino Control Act, which implements the Constitution’s gambling clause, it is the pronounced policy of this State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State’s regulatory machinery can be sustained.... This public policy calls for standards controlling the conduct of the State’s officials and public employees In dealing with casino entities. The legitimacy of these governmental concerns, reflected in the current New Jersey conflicts of Interest Law, cannot be doubted and impel the strongest deference and support on the part of the judicial branch of government, [at 392, 431 A.2d 833]
I direct that:
1. The firm is disqualified from representing taxpayers in these matters.
*213 2. Taxpayers are to engage new counsel to represent them in these matters pending before the Tax Court. In making the selection of new counsel, taxpayers shall not consult with the firm.
3. The existing files of the firm relating to these matters may be provided to new counsel. However, if the files contain any work product indicating strategy and tactics to be used based on the firm’s knowledge of the city’s attitude toward litigation and toward the settlement of litigation by reason of the firm’s representation of the city, such work product shall not be delivered to new counsel.
4. The firm shall not engage in any consultations with new counsel concerning these matters pending in the Tax Court.
Counsel for the city will submit an appropriate order under R. 4:42-l(b).
In order that taxpayers are not prejudiced by this ruling, new counsel may make such motions as are necessary to insure that there is not an unduly early trial date.

Geoffrey C. Hazard, Jr. is now Nathan Baker Professor of Law at Yale Law School and Deputy Dean of the Yale School of Organization and Management.

In view of Lieberman v. Employers Ins. of Wausau, 84 N.J. 325, 419 A.2d 417 (1980); Longo v. American Policy Holders Ins. Co., 181 N.J.Super. 87, 436 A.2d 577 (Law Div.1981); Bartels v. Romano, 171 N.J.Super. 23, 407 A.2d 1248 (App.Div.1979); Advisory Opinion 466 and the firm’s argument in this matter, a reconsideration of Advisory Opinion 428 would appear to be in order and, if not generally, certainly as it applies to Atlantic City. Knight v. Margate City, 86 N.J. 374, 431 A.2d 833 (1981).

The filing of the motion indicates the city’s present position. Even outside the area of public interest, the firm would be disqualified from representing either client. “As observed by Drinker [Drinker, Legal Ethics (1953), 112], ‘When the interests of clients diverge and become antagonistic their lawyer must be absolutely impartial between them, which, unless they both or all desire him to represent them both or all, usually means that he may represent none of them.’ ” Clark v. Corliss, 98 N.J.Super. 323, 327, 237 A.2d 298 (App.Div.1967).

The claim of the first client involved approximately $200.