The opinion of the court was delivered by
CARCHMAN, J.A.D.
Defendant, Boardwalk Regency Corp., owns eights lots on and near the Boardwalk in Atlantic City. It filed complaints with the Atlantic County Board of Taxation (County Board) to challenge its property tax assessments, and the County Board subsequently substantially reduced the assessments from approximately $173 per square foot to approximately $110. Plaintiff, City of Atlantic City, filed a complaint with the Tax Court appealing the County Board’s judgments for defendant’s eight lots. Judge Rimm, in a thorough and thoughtful oral opinion, reinstated the original assessments on the eight lots. Defendant appeals.
On appeal, defendant contends that: (1) the judge’s rejection of the Chrysler First Business Credit (Chrysler) listing and ultimate sale (the Chrysler sale) as a comparable sale is factually unsupported by the record; (2) the judge committed reversible error by allowing the Mount Royal sale to be used as a comparable; (3) it was legal error for the judge to rely on the Golden Nugget and Sands assemblages; (4) there is not substantial credible evidence in the record to support the judge’s opinion regarding the nature of the market for casino-hotels in Atlantic City as of the valuation date and his opinion ignores the clear evidence concerning the substantial and marked change in market conditions over time; and (5) this court must reverse the judgment because the judge’s decision contains cumulative errors that patently ignore the uncon-troverted evidence at trial. Our review of the extensive record leads us to conclude that defendant’s arguments are without merit; accordingly, we affirm.
I.
We recite in detail the facts adduced during the extensive trial in the Tax Court. Our extravagant presentation of the facts is necessitated by and addresses defendant’s primary challenge on appeal — that the trial judge’s decision was not supported by the record. In our recitation, we focus our attention on the conflicting opinions of the experts.
*169 Defendant’s property consists of two adjacent contiguous tracts: Lots 82 and 100 in Block 26, at 147-193 South Illinois Avenue (now called Dr. Martin Luther King, Jr. Boulevard); and Lots 22, 39, 54, 55, 56, and 59 in Block 30, at 1715-1743 Boardwalk, between South Illinois Avenue and South Indiana Avenue. Block 30 is the former site of the Traymore Hotel and is 200,103.65 square feet or 4.594 acres. Block 26 is the former Traymore skating rink with 60,205.89 square feet or 1.382 acres. The eight lots combined comprise 260,309 .54 square feet, or 5.976 acres. Not subject to the appeal is Block 26, Lot 193, with 48,542.31 square feet or 1.114 acres, which is also owned by defendant (and deemed part of the same economic unit by Judge Rimm).
Presently Block 26 is improved with a 200-car parking lot and Block 30 is improved with fourteen Boardwalk retail stores totaling approximately 25,000 square feet and a 499-car parking lot. The fourteen stores are all leased and have an aggregate rental of approximately $678,000 per year.
The property is zoned RS-C, for resort casino use, which allows, among other commercial uses, casino-hotels, hotels, motels, motor inns, marinas, high-rise density apartments, retail stores, and banks. Minimum lot size for development is two acres. However, both experts testified that optimum size for a casino, at the relevant time for tax year 1994, was approximately six to seven acres or more.
Plaintiffs expert appraiser, Richard M. Chaiken, of Appraisal Consultants Corp., opined that the fair market value of the Traymore site was $58,543,000, or $225 per square foot, plus $500,000 for the interim value of the improvements, for a total of $59,043,000. In his appraisal report of August 28, 1995, he concluded that the existing uses of the property were interim uses and the highest and best use was for development with a new casino-hotel or expansion of an existing casino-hotel.
Chaiken traced the history of casino development in Atlantic City and explained that although there was a peak in the market in 1986, the bottoming out occurred in 1991, with tentative beginnings of an increasing market in 1992. By the end of 1992, it was *170 apparent that the three-billion-dollar market shared by the twelve casino-hotels would expand to four billion, resulting in a push for expansion of facilities. He noted that greater cooperation between government and private operators was becoming a reality that would also spur this greater development. Although this was not an accomplished fact in 1993, it was evident that there was a new interest in the market that was expanding.
He concluded that over the next five years from the appraisal date, the number of hotel rooms could double or triple, and casino size could also double or triple. This was due to a number of factors: the advent of twenty-four-hour gambling in 1992; relaxation of the thirty-percent limit on slots; the new Convention Center with ground-breaking in 1993; new entrants to the market such as Hilton and Sheraton, and the possible return of Steve Wynn; potential for simulcasting and new games; relaxation of the most prohibitive regulations; use of Casino Reinvestment Development Authority (CRDA) funds/investment credits for hotel rooms within or adjoining existing casinos; and anticipation of the creation of destination resort activities including shopping, theaters, and entertainment facilities.
To corroborate the anticipated growth, Chaiken observed that by October 1993, in addition to the new Convention Center and CRDA’s new corridor from the Boardwalk to the Center, eight casino operators planned to start building almost 3500 new rooms.
Chaiken considered all three approaches to value, but relied only on the sales comparison approach because of the property’s highest and best use. He used an income analysis to set the value of the interim uses: anticipated net income for a defined term discounted to present worth.
To find value, Chaiken relied on four comparable sales. Sale # 1, the Golden Nugget assemblage, consisted of five sales in the RS-C zone, located between Boston Avenue and Sovereign Avenue, and between Pacific Avenue and the Boardwalk. These assemblage sales all occurred between January 1983 and December 1984 with a mid-point in January 1984, and ranged from a low of $110 per square foot to a high of $325 per square foot. In *171 addition, Chaiken considered Seashore Club condominium units that sold for $580 per square foot. Without the condominiums, the partial assemblage reflected $226 per square foot.
Sale # 2, the Sands assemblage, consisted of thrqe sales in Block 26 that closed between July 19, 1985, and May 1, 1986. Greate Bay Hotel & Casino, known as the Sands, acquired these lots for construction of a parking garage for its casino-hotel. They averaged $199 per square foot. Chaiken did not combine this sale with another sale for another parcel for the same garage that occurred in March 1994 because he felt that there was additional consideration for that sale not documented in writing.
Sale # 8 was the former Penthouse site that Boardwalk Properties, Inc., sold to Donald J. Trump on May 5, 1989. We omit the details of the sale since it was not considered by Judge Rimm nor is that determination the subject of this appeal.
Sale # 4 was the Sehiff Enterprises sale of the Mount Royal Motel at 1801 Pacific Avenue to the Claridge Hotel-Casino on January 5, 1995. The Claridge paid $7,000,000 for the 29,120 square-foot parcel that contained an operating motel, which was $240.38 per square foot. The Claridge then demolished the motel and extended its parking garage. The cost of demolition was $625,000, so the total cost was $7,625,000, or $262 per square foot.
Chaiken calculated adjustments for time and market conditions over a fifteen-year period, ranging from adjustments of fifty percent for years 1978 to 1980, to a negative adjustment of ten percent for the years 1987 to 1990. During some years, no adjustment was necessary. For location, Chaiken observed that Boardwalk frontage, and to a lesser degree, Pacific Avenue frontage, were “plus” locational attributes. Since the RS-C zone depth at the Golden Nugget/Bally’s Grand end of the zone was only approximately 400 feet and the depth at the eastern end was approximately 2000 feet, the ability to bridge Pacific Avenue with cheaper MCR-zoned land meant that RS-C-zoned land at the eastern end had a lower unit value than land at the Golden Nugget/Bally’s Grand end. Chaiken added that land at the western end of the zone was considered superior.
*172 Chaiken also made adjustments to each sale for various factors, including location, terms and conditions, physical attributes and approvals. After weighing all of the adjustments, Chaiken arrived at the following adjusted unit values: sale # 1 — $240 per square foot; sale # 2 — $167 per square foot; sale # 3 — $266 per square foot; and, sale # 4 — $309 per square foot.
Based on the first three sales, Chaiken concluded that defendant’s property should be valued at $225 per square foot. He used sale # 4, which postdates the value date, to provide support and corroboration for that figure, and determined that defendant’s property was worth $58,543,200, which he rounded to $58,543,000.
Because the anticipated income from the retail stores and parking lots totaled $2,178,000 per year and the total expenses (including operating expenses, ground lease, and real estate taxes) totaled $2,165,000, he concluded that the contributing value of the interim use facilities was “essentially nil.” However, since this property would be superior to a property with no income stream that still had to pay real estate taxes, he determined that the contributing value of the interim use facilities should be $500,000, which included the future obligation to raze the improvements. His final value estimate was $58,543,000 for the land plus $500,000 for contributing value from the interim use facilities, for a total, as of October 1,1993, of $59,043,000.
Chaiken rejected the Chrysler acquisition by Bally’s as not representing market value because of distress and investment value. Bally’s had told Chrysler that it was not interested in the site but then used a parking lot operator as nominee to buy the property. Thus, Bally’s and Chrysler did not meet on a level negotiating field.
Chaiken also rejected the August 1, 1989 Resorts International sale to Masscon Realty Corporation of 93,728 square feet of land at $41.47 per square foot. This was because it was common knowledge that Resorts was nearing bankruptcy, “the offerings attracted bottom-fishing bargain hunters,” and thus the sales price did not reflect market value.
*173 In his supplemental appraisal report of December 20, 1996, Chaiken noted additional information about his sale # 4. Simultaneous to that sale, Claridge purchased a tract at Indiana Avenue from Robert Sehiff for $48.26 per square foot. Since sale # 4 was from Robert and Abraham Sehiff, Chaiken did not aggregate the two sales for a total of $7.5 million. He also noted that the zoning was disparate, and the Claridge did not use this additional property for the same purposes. However, even if this were counted as one assembled sale, the unit value would be $245 per square foot (instead of $309) and equally corroborative of his unit value for defendant’s property.
In addition, in his supplemental i’eport, he noted that ITT Sheraton and Planet Hollywood, Inc., intended to develop a casino-hotel on defendant’s property. The casino market showed the following additional plans and current construction: 308 rooms under construction in 1995-96 for Bally’s Grand; 69 more rooms and 60,000 square feet of casino space for Bally’s Park Place; 620 rooms and an 1800 square-foot ballroom for Caesar’s; 412 rooms and 13,000 square feet of casino space for Harrah’s; 1000 more rooms and a 50,000 square foot casino addition for Resorts. Sands was planning expansion across Pacific Avenue with the purchase of the Midtown Motel; Trop-World had a 628-room tower under construction in 1995; and Trump Plaza planned 361 rooms and 11,000 square feet of casino space by absorbing the former Penthouse site and adding the Trump World’s Fair property (formerly operated as the Playboy Casino-Hotel, then as the Atlantis Casino-Hotel, and then as the Trump Regency Hotel). The Taj Mahal planned 1280 rooms, 2437 square feet of pai'king spaces, and additional casino space; MGM planned to build on the urban renewal tract; and Steve Wynn planned to build three new casinos. Finally, he noted that the Claridge had already built its self-park garage and the Showboat had completed a 300-room expansion and a 35,000 square foot casino addition. In Chaiken’s opinion, the casino industry outlook was positive.
Anthony S. Graziano, defendant’s appraiser from Atlantic Coast Realty Advisory Group, stated that defendant’s property was *174 worth $25,100,000, or approximately $96 per square foot on the assessment date.
He concluded that the highest and best use of defendant’s property as if vacant was for investment purposes as a future casino-hotel site with an interim potential for surface parking by variance and some development of the Boardwalk frontage areas. The highest and best use as improved was “more prudent management and long term commitment to the continued operation [of interim uses] to encourage full maximization of the property’s inherent values with the possible future development of a hotel site when an adequate market develops in a 7 to 10 year frame.”
Graziano concluded that defendant’s property could only be valued by the cost and income capitalization approaches. Because defendant’s property, is “an extremely unique parcel of land,” there is little relevant market data for applying a direct sales comparison approach.
Under the cost approach, Graziano first estimated value for the property as vacant and. ready for its highest and best use. Grazi-ano made two groupings of comparable sales that he referred to as “out-parcel” and “assemblage” sales. The out-parcel land sales were purchased by non-gaming operators or for non-gaming uses, while the assemblage sales were parcels that were either large enough to potentially constitute a casino site, or smaller pieces to be consolidated into larger holdings. He summarized this data as showing a precipitous drop in price for the period of 1989 to 1991. Since he found current available properties listed in the range from $20 to $135 per square foot, this showed that market demand and pressures for future casino sites and expansion sites had diminished.
Graziano’s assemblage land transactions were four sales and four property listings from April 1989 until March 1994. Sale # 1 was the Trump Plaza garage, located on Atlantic Avenue between Mississippi and Missouri Avenues, which sold in April 1989 for $107.89 per square foot. Trump Plaza incorporated the 38,766 square-foot parcel into what is now the Trump Plaza parking garage.
*175 Sale # 2 was the Masscon Realty site that Masscon purchased in August 1989 and that consists of 93,728 square feet. It is located between Connecticut Avenue, the Boardwalk, and Massachusetts Avenue and Masscon bought it for $41.47 per square foot.
Sale # 3 was the Tropieana surface parking. Tropieana purchased numerous small lots between 1990 and 1996, located between Pacific Avenue and Atlantic Avenue, and Stenton Avenue and Iowa Avenue in the RS zone, and sold for $75.06 per square foot. The area totaled 29,110 square feet.
Sale #4 was the Showboat expansion at New Jersey and Delaware Avenues, a 143,132 square-foot property in Atlantic City’s urban renewal tract that the Atlantic City Housing Authority sold to the Showboat in July 1993 for a net price of slightly in excess of $32 per square foot.
Sale # 5 through sale # 8 were listings and not sales. Sale # 5 was a listing for the former Woolworth building on the Boardwalk at Ocean Avenue. The 25,380 square-foot parcel was listed in January 1994 for $102.44 per square foot.
Sale #6 was the former Mayflower site at the Boardwalk between Tennessee Avenue and St. James Place. The 92,000 square foot parcel was listed in January 1994 without a specific price, which Graziano designated as “make offer.”
Sale # 7 was the former Golden Nugget Site (A.C. Holding Co.) at Albany, the Boardwalk, and Hartford. The 97,750 square-foot parcel was listed in March 1994 at $81.84 and $132.99 per square foot.
Sale # 8 was the Resorts acreage tract, 370,260 square feet, at Brigantine and Delaware in the Marina district, which was listed for sale in March 1994 for $18.91 per square foot.
Graziano’s out-parcel comparables were seven sales and one listing of RS-C-zoned parcels ranging from 2730 to 132,938 square feet, dating from December 1989 to April 1994, and ranging from $10.52 to $66.67 per square foot.
Graziano determined that there was much more demand for Boardwalk frontage, so he concluded that approximately 36,200 *176 square feet of defendant’s property (362 feet by 100 feet depth) along the Boardwalk should be valued at $125 per square foot, but the remaining area of “rear lands” should be valued at $50 per square foot. He calculated 36,200 square feet of Boardwalk frontage at $125 per square foot which equaled $4,525,000; 224,-421 square feet of off-Boardwalk tracts at $50 per square foot which equaled $11,221,050; and together they totaled $15,746,050. He then added twenty percent as an assemblage premium “to recognize that significant boardwalk frontage is afforded and the continuity of ownership offers great benefits to the tract overall.” Thus, he calculated $18,895,260 as the overall value of defendant’s land as if vacant, that he rounded to $18,900,000. Graziano concluded that this valuation, equivalent to approximately $72.50 per square foot, fell “well within the parameters of reasonableness when one views the overall market, actual sales, [and] offerings and considers the economic and competitive positions of the subject property in the marketplace as of October, 1993.”
Next, to determine land values under the cost approach, Grazi-ano used three sales and two listings in a direct sales comparison. Sale # 1 was a 143,132 square-foot parcel that the Atlantic City Housing Authority sold to the Showboat in July 1993 for $4,618,000. To this value of $32.26 per square foot he made various adjustments for transaction and location for a total of $73.40 per square foot. He acknowledged that it was not an arm’s-length sale because a government agency was involved that provided incentives to encourage development in the uptown urban renewal area.
Sale # 2 was a March 1993 listing by the Atlantic City Housing Authority for 97,750 square feet at $81.84 per square foot which remained the same after adjustments.
Sale # 3 was a 15,000 square-foot parcel sold in September 1993 from S.A.B. Associates to the Lafayette Hotel for $500,000 or $33.33 per square foot adjusted to a unit price of $66.67 per square foot.
Sale # 4 was a 29,110 square-foot parcel sold in August 1991 from various sellers to Adamar of New Jersey for $2,185,000 or *177 $75.06 per square foot adjusted to a unit price of $78.81 per square foot.
Sale # 5 was the 135,790 square-foot parcel listing as of October 1993 by Chrysler for $10,184,250 or $75 per square foot. Graziano made a -20% listing adjustment and a +20% adjustment for physical characteristics because of an odd shape for an adjusted unit price of $72 per square foot.[1]
Based on these five adjusted unit prices, he found a final unit value of $75 to $80 per square foot, which reflects a value of defendant’s property from $19,546,575 to $20,849,680. Based on the stipulated size of the property at trial, he recalculated these figures to between $19,523,000 and $20,824,800. Because of defendant’s property’s location and physical configuration, which he concluded “represents one of the most appropriately located sites if demand and financial viability can be demonstrated for future casino development,” he found that the land as vacant was worth the higher value of $21,000,000. This final figure did not change based on the stipulated size of defendant’s property.
Under the cost approach, Graziano took his estimated land value of $21,000,000 and added $2,626,432 as the net present day cost estimate for building and site improvements to conclude that total value was $23,626,432, which he rounded to $23,600,000. Graziano next conducted an income capitalization approach, concluding that defendant’s property is worth $25,100,000.
Based on his value indications under the cost and income capitalization approaches, Graziano concluded that final value of defendant’s property was $25,100,000. This was because the income approach “tends to level out the enhanced value that the location of this property has and the income potential that the land has.” He then allocated value between improvements and land, and applied the Chapter 123 ratio ($25,100,000 x .9486) for a total of $23,809,860.
*178 II.
Judge Rimm treated the six lots of the Traymore site, the two lots of the Traymore rink site, and one additional lot not under appeal (block 216, lot 193) as one economic unit. These lots totaled 7.09 acres.
The judge determined that the parcels were “basically vacant land and are to be valued as though vacant.” He found that the highest and best use of the property was for hotel-casino use. He also stated that he incorporated the three findings of fact that he made on August 26, 1997. Those findings were: there was no additional consideration for the last sale in the Sands assemblage beyond that set forth in the deed; the Penthouse sale was not a comparable sale for valuation purposes in this case because it cannot be reasonably adjusted to the subject; and the highest and best use of the property, including an additional lot not subject to the appeal but part of the same economic unit, was for casino-hotel development with existing improvements as interim uses.
In setting value, Judge Rimm relied on three comparable sales: the Golden Nugget sale, rejecting a portion of the information and data on which Chaiken relied; the Sands assemblage sale; and the Schiff sale of the Mount Royal Motel to the Claridge. The judge determined that defendant’s properties, including Lot 193, should be valued at $160 per square foot.
Judge Rimm did not add any additional value for interim use or cost of demolition, noting that Chaiken did not deal “in a meaningful way with value of an interim use, nor did he deal with the cost of demolition.” The judge rejected Chaiken’s value of $500,000 for interim use, noting that it was not supported by his testimony.
Addressing Graziano’s opinion, Judge Rimm noted that he could have made “short shrift” of it because the expert did not include Lot 193 and that lot was part of this one economic unit. First, Judge Rimm rejected Graziano’s income approach because it did not value the economic unit at its highest and best use. The income approach was a valuation of interim uses that were Boardwalk retail stores and parking lots.
*179 The judge observed that it was “unusual” that there were five sales in Graziano’s land sale adjustment grid, but there was no testimony of any meaningful nature which explained Graziano’s own conclusion that the land sales adjustment grid basically represented the direct sales comparison analysis in his cost approach for the assemblage land sales and for the out-parcel land sales. The judge noted that Graziano relied on the three sales and two listings for his land component part of the cost approach.
Judge Rimm concluded that the eight assemblage sales did not assist him in valuing defendant’s property. He explained that assemblage sale # 1, the Trump Plaza garage, is zoned CBD, or central business district, and that zoning does not allow casinos. Thus, the value of CBD property was, by its very nature, considered lower than the value of property where casinos are permitted in the RS-C zone.
Assemblage # 2, the Masscon property, in the inlet section where there was no significant commercial development at the time of the sale, and considerably east of the most easterly casino-hotel on the Boardwalk, was not in an area similar to the central Boardwalk casino-hotel area.
Assemblage sale # 3, Tropicana surface parking, is located in the RS zone where casino uses are also prohibited, while Assemblage sale # 4, the Showboat expansion in the URT, the uptown renewal tract zone, was not representative of market value because sales in that zone are in furtherance of the goals of the uptown renewal plan. Judge Rimm added that Graziano used this sale despite denoting it as nonarms-length, and he was troubled by an appraiser who designates a property as such and then attempts to adjust it.
Judge Rimm rejected assemblage sale # 5, the Woolworth building listing, noting that the Woolworth property eventually sold at a different price, and he rejected assemblage sale #6 because it was a listing that under the net sales price, Graziano called “make offer.” The judge had “no idea how the Court can be expected to use that sale.”
*180 Addressing assemblage sale # 7, the former Golden Nugget site, Judge Rimm noted that the property was in two different zones, RS-C and RM-4, and that the latter zone only allowed multi-family residential use. He explained that consideration of this listing involved a listing of property in a completely different zone.
Explaining that assemblage sale # 8 was located in the marina district, Judge Rimm noted that although recent developments had made that area attractive to investors, it was not similar to the RS-C zone located on the Boardwalk and specifically the central casino district on the Boardwalk. He concluded that no location adjustment could make up the dissimilarity between sale # 8 and defendant’s property.
Addressing Graziano’s five sales and listings in his land sale adjustment grid, he rejected grid sale # 1, the same property as assemblage sale # 4, because it was located in the URT zone. He rejected grid sale # 2, the same former Golden Nugget site used as assemblage sale # 7, for the same reasons he gave earlier. Grid sale # S, a sale from S.A.B. Associates of the former Lafayette Hotel, was a parking lot used as such for interim purposes. It was acquired by the owner of adjoining properties who did not have adequate parking and it did not have the same highest and best use as defendant’s property. He rejected grid sale # 4, the same as assemblage sale #4, for the same reason that he did earlier.
Grid sale # 5, the Chrysler property, was a listing that ultimately resulted in a sale. The judge rejected it because there was a later sale, and because “the seller did not recognize the potential value of the. property for casino-hotel development purposes.” The judge explained that the ultimate sale involved a straw purchaser, it was a property obtained by foreclosure, and the seller was not in the real estate business. The judge opined that this was a transaction more influenced by business than by real estate decisions. He also applied this comment to the Woolworth sale.
*181 Addressing Graziano’s decision to value Boardwalk frontage areas for a 100-foot depth at $150 per square loot, and the rest of defendant’s property at a lower per-square-foot value, the judge concluded that this was contrary to the appraiser’s decision to value the lots as one economic unit. The judge questioned the basis for this decision, noting that if the Boardwalk area was $150 per square foot, then the entirety of defendant’s property should be valued the same way.
He concluded that the fair market value of defendant’s properties, including Lot 193, was $49,416,296, which he rounded to $49,416,000. He calculated this figure by multiplying $160 per square foot by 308,851.85 square feet.
Turning to the application of the Chapter 123 ratio, he noted that the ratio for 1994 for Atlantic City was 94.24%, with the lower limit of the common level range at 80.10% and the upper limit of the common level range at 108.38%, leveled to 100%. He determined the ratio of the assessed value of the economic unit in this case to its fair market value by dividing the aggregate assessment of all of the lots of $47,002,000 by the fair market value of $49,416,000. The ratio of the assessed value to the fair market value was 95.11%, which was within the common level range, so he concluded that there would be no change in the assessments. Next, the judge took the aggregate assessment of $47,002,000 and subtracted the assessment of $2,002,000 for Lot 193, leaving $45 million, the amount of the assessments in the aggregate originally placed in the books by the assessor.
Judge Rimm sustained all of the original assessments on the eight lots and ordered judgments entered increasing the County Board judgments back to the original assessments.
A
Defendant contends that Judge Rimm’s rejection of the Chrysler listing and ultimate sale as a comparable sale is factually unsupported by the record. We disagree.
The Chrysler property was listed for sale on the assessment date, October 1, 1993, at $75 per square foot. Defendant asserts *182 that it was the closest to its property in both size and location, and the only property examined by the experts that was an approved casino site and large enough to support a casino.
Judge Rimm rejected the Chrysler sale in part because “the seller did not recognize the potential value of the property for casino-hotel development purposes” and had obtained the property through foreclosure. Defendant asserts that these reasons are wholly unsupported by the record and inconsistent with the clearly relevant and uncontroverted evidence.
Graziano noted that Chrysler sold its property to Bally’s in December 1994 for the value-equivalent of $8,600,000, or $63 per square foot. He believed that this information was extremely meaningful because it demonstrated the validity of using listings, that the market was stagnant, and that core prices were approaching the level where it would become economically viable to buy land to build casinos or additional casino space.
Listings, in addition to sales, are admissible as evidence of value. See, e.g., American Cyanamid Co. v. Wayne Township, 17 N.J.Tax 542, 558 (Tax 1998) (rejecting a listing because it was too dissimilar to the subject property to qualify as a comparable); Schmertz v. Township of Dover, 4 N.J.Tax 145, 151 (Tax 1982) (citing the Appraisal Institute, The Appraisal of Real Estate 293 (7th ed.1978)) (noting that listings are analyzed much the same way as are actual sales).
Defendant maintains that Judge Rimm’s decision was improperly premised on the fact that Bally’s acquired the property by using a straw purchaser, a factor that Chaiken candidly admitted, standing alone, was an insufficient reason to disqualify use of the listing and sale. However, Judge Rimm stated that this was just one factor that added to the finding that the listing was not indicative of the trae value of the property.
Defendant asserts that the judge’s focus on the inchoate “potential” of the Chrysler property is improper speculation, particularly in light of Chrysler’s obvious knowledge of the property’s suitability for casino-related use, and its frustrated efforts to sell it for *183 such use. However, the judge noted that the seller was not a real estate investor knowledgeable of Atlantic City.
Defendant contends that Judge Rimm’s other basis for rejecting the sale — that it had been obtained through foreclosure — is also an insufficient reason, standing alone, to reject the use of this sale. Defendant explains that while Chrysler obtained the property through foreclosure, the proofs are undisputed that it was under no pressure from bank examiners or other regulators to liquidate the property, that the land had been actively marketed for between three and four years, and that it had been offered to, and declined by, the two nearest casinos.
While it is true that the seller was not under outside pressure to sell the property, Chaiken testified that there was internal pressure to sell. Chaiken did analyze the seller’s position as a creditor, and said that it was not making any money by keeping this site. He opined that Chrysler was not a real estate investor and wanted to sell the property so that it could get back to its business of earning money on loans.
Relying on Hull Junction Holding Corp. v. Princeton Borough, 16 N.J.Tax 68, 94 (Tax 1996), defendant claims that “[t]he fact that a seller acquired a property through foreclosure is relevant only if and to the extent that such circumstance affects the seller’s motivation or places him or her under duress.” Having to pay extensive carrying costs can place a party under duress, and can affect business reasons for selling a property.
Defendant argues that valuation considerations alone contributed to Chrysler’s decision to sell. Chaiken testified to the contrary, and Judge Rimm did not err in determining that business considerations played a role as well.
B.
Defendant next asserts that Judge Rimm committed reversible error by allowing the Mount Royal sale to be used as a comparable.
*184 Defendant notes that the sale occurred on January 5, 1995, approximately sixteen months after the valuation date. Defendant focuses on Judge Rimm’s decision where he justified using the sale, although it occurred after the assessment date, by reciting that subsequent events can be used to corroborate an opinion arrived at based on facts known as of the assessment date. Defendant contends that post-assessment date sales may be used only for limited purposes in the valuation process.
This issue has been addressed in three recent Tax Court decisions: Newport Center v. City of Jersey City, 17 N.J.Tax 405, 425-26 (Tax 1998); City of Atlantic City v. Ginnetti, 17 N.J.Tax 354, 365 (Tax 1998), aff'd, o.b., 18 N.J.Tax 672 (App.Div.2000); and Prudential Ins. Co. v. Township of Parsippany-Troy Hills, 16 N.J.Tax 58, 64 (Tax 1995), aff'd, 16 N.J.Tax 148 (App.Div.1996).
In Newport Center, supra, 17 N.J.Tax at 425-27, Judge Kuskin reviewed the principles of law applicable to the use of post-assessment date sales. He cited to Stanford Enterprises v. City of East Orange, 1 N.J.Tax 317 (Tax 1980), where the Tax Court held that post-assessment date sales could be used to corroborate an opinion of value based on pre-assessment date information. Judge Kuskin added that the Stanford Enterprises court also noted that: “ ‘Whether such subsequent events, when offered in conjunction with evidence known or reasonably anticipated as of the assessing date, are used in corroboration or as direct evidence is more theoretical than real.’ ” Newport Ctr., supra, 17 N.J.Tax at 425 (quoting Stanford Enters., supra, 1 N.J.Tax at 324). See also Borough of Little Ferry v. Vecchiotti, 7 N.J.Tax 389, 398 (Tax 1985) (noting that “unless a subsequent event is clearly barred by considerations such as remoteness in time or location, or is virtually totally dissimilar to the property in question, the mere fact that it took place subsequent to the assessment date should not bar it from consideration in the valuation process”); Borough of Fort Lee v. Invesco Holding Corp., 3 N.J.Tax 332, 340-42 (Tax 1981), aff'd in part, rev’d in part and remanded on other grounds, 6 N.J.Tax 255 (App.Div.), certif. denied, 94 N.J. 606, 468 A.2d 238 (1983) (explaining that subsequent events should not be used as direct evidence of value, but can be used to corroborate an opinion *185 independently arrived at and based on facts known or reasonably ascertainable as of the assessment date); Almax Builders, Inc. v. City of Perth Amboy, 1 N.J.Tax 31, 37 (Tax 1980) (applying the concept of relevance to such sales and concluding that “[s]o long as a proffered sale is not remote, the sale should be admitted for its rational probative valuation inference”).
In City of Atlantic City v. Ginnetti, supra, 17 N.J.Tax at 365, Judge Rimm also used post-assessment date data “because such data is of assistance in ultimately determining what the fair market value of the subject properties is.” See also Prudential Ins. Co. v. Township of Parsippany-Troy Hills, supra, 16 N.J.Tax at 59, 64 (determining the value of a hotel by relying in part, on average daily room rates of the hotel in 1988, prior to the assessment dates, and in 1994, after the assessment dates, because the 1994 rate was corroborative of the 1988 rate).
Defendant argues that because Judge Rimm relied on the Golden Nugget assemblage sales from 1983-84 and the Sands garage sales from 1986-87, the Mount Royal sale from January 5, 1995, cannot corroborate facts known or reasonably ascertainable as of October 1, 1993. The Mount Royal sale corroborates the value arrived at by relying on the other two sales; the time difference in the dates of the sales does not automatically invalidate use of the Mount Royal sale. Judge Rimm adjusted the first two sales to determine market value of defendant’s property on the assessment date, and the Mount Royal sale corroborates that value.
Next, defendant asserts that Judge Rimm wholly ignored the uncontroverted testimony of Claridge representatives who dealt in the actual sale. Defendant claims that its witnesses demonstrated beyond conjecture that the Mount Royal sale was not a market value transaction.
Defendant relies on testimony that when Robert Schiff, a seller, was contacted, Schiff stated that the property was not for sale and not listed with a broker. In addition, the Claridge had to build a *186 self-park garage to compete with the other casinos in Atlantic City and this site was the only one available. ,
Defendant notes that it was critical that the Claridge construct a self-park garage, and that the Mount Royal site was the only one available at the time. Defendant relies on testimony that the Claridge would have spent between $10,000,000 and $13,000,000 for the Mount Royal site and had entered into a bond indenture with money earmarked for construction of the garage prior to entering into an agreement of sale.
Defendant’s reliance on Hull Junction Holding Corp. v. Princeton Borough, supra, 16 N.J.Tax at 94, where the judge listed factors to be considered when deciding whether the sale of the property being assessed is a reliable indicator of market value of that same property, is misplaced. Here, no sale of defendant’s property was considered.
In Ford Motor Co. v. Township of Edison, 127 N.J. 290, 307, 604 A.2d 580 (1992), the Supreme Court stated that the trial court must be granted “‘a wide discretion’ in determining the admissibility of sales sought to be relied on as comparable.” “Evidence of comparable sales is effective in determining value only where there is a substantial similarity between the properties so as to admit of reasonable comparison.” Newark City v. Cedar Grove Township, 7 N.J.Tax 66, 76 (Tax 1984). Here, there is substantial evidence that these properties are similar in that they are both sites next to casinos that are in the same zone.
Defendant claims that the buyer and seller were typically motivated and that the property was not exposed to an open, relevant, and competitive market for a reasonable period of time. While there is testimony in the record that the Claridge specifically wanted to build a self-park garage, other casino's that buy adjoining properties have similar motivation in wanting to expand casino space or the number of them hotel rooms. The record contains information on the Sands’ acquisition of parcels to build and expand its self-park garage.
The question of exposure to the market for a reasonable period of time is less clear. While both experts opined that this is a *187 relevant factor for determining whether a sale can be used as a comparable, Chaiken also stated that every property in the RS-C zone in Atlantic City has been for sale since 1979, even if not officially listed on the market. Atlantic City’s RS-C zone is a special market in which every property is for sale for ultimate assemblage into the casinos, and almost every property owner recognizes that the highest and best use of these properties is for development into a hotel-casino.
Plaintiff also responds that there was an alternate garage site location available that was on the market for $15,000,000. Plaintiff explains that since the Mount Royal site was the Claridge’s first choice, the Claridge did not pursue this other site further. The record supports that factual contention.
Most significantly, the Mount Royal sale had minimal impact on Judge Rimm’s conclusion of value. He adjusted the Sands assemblage to $139.30 per square foot for an October 1, 1993, value, and adjusted the Golden Nugget assemblage to $203.40 per square foot for the same date, which together averaged out to $171 per square foot. Even without considering the Mount Royal value of $240 per square foot, he concluded that the $171 per square foot figure was too high. Since he ultimately found a value of $160 per square foot for defendant’s property, reliance on the Mt. Royal sale appears to be minimal.
C.
Defendant next maintains that it was error for Judge Rimm to rely on the Golden Nugget and Sands assemblages because the sales were too old to be used as comparables, and the sales had not been exposed to the open market.
 Although courts are reluctant to rely on sales that are remote in time relative to the assessment date, there is no fixed rule for rejecting comparables based on date. Newer data is generally preferable to older data.
In the three cases that defendant cites where the Tax Court rejected comparable sales as too remote in time, the judge relied on other comparable sales that were similar to the property being *188 assessed. In Badische Corp. v. Town of Kearny, 11 N.J.Tax 385, 402-03 (Tax 1990), the judge rejected three of the plaintiffs four comparable land sales and one of the defendant’s five comparable land sales as too remote in time to be probative, but relied on two of defendant’s other sales that were comparable in size, location, and zoning to the assessed property. In Glenpointe Associates v. Township of Teaneck, 10 N.J.Tax 288, 303 (Tax 1988), the judge rejected the plaintiffs land value because it was based on the contract of sale for the property entered into five years earlier, but relied on the defendant’s comparable land sales that were “well documented and otherwise amply supported by the credible evidence.” In Hackensack Water Co. v. Woodcliff Lake Borough, 9 N.J.Tax 545, 556 (Tax 1988), the judge rejected one of defendant’s five sales that occurred six years prior to the assessment date as too remote to be probative, but relied on the plaintiffs five comparable sales that were in the same borough as the assessed property and in reasonable proximity in time to the assessment dates. Here, Judge Rimm determined that there were no other sales (except the Mount Royal sale) that were comparable to defendant’s propei’ty and closer in time to the assessment date.
Even though the two sales occurred between seven and ten years before the' assessment date, defendant is mistaken that they did not in any way reflect fair max’ket value of them property. Chaiken explained why he relied on sales that are older.
Defendant also ax-gues that these two sales must be injected because they were not exposed to the open market. Chaiken agreed that a sale can only be used as a comparable if the property is exposed for a reasonable time in the open market. However, he explained that assemblages are different because there are numerous lots involved. With an assemblage, the overall price paid reflects the give-and-take of the mai’ket, -with the first tracts contracted either being cheaper or the key tract. Since an assemblage sale price is calculated by averaging a number of sales, there is a distinct difference from a single sale of a property not placed on the max’ket.
*189 D.
Defendant asserts that we must reverse the judgment because the judge’s decision contains cumulative errors that patently ignore the uncontroverted evidence at trial. Defendant contends that there are four errors that cumulatively require reversal: (1) misuse of the A.C. Holding/Golden Nugget listing; (2) refusal to use the Sands purchase of Lot 117, Block 26; (3) failure to use the Woolworth listing; and (4) misapplication of the “single economic unit” principle. The latter three arguments are without merit and require no further discussion. R. 2:ll-3(e)(l). However, since plaintiff agrees that Judge Rimm erred in misusing the A.C. Holding/Golden Nugget listing, we will briefly address that issue.
Graziano relied on the listing of the 97,750 square-foot A.C. Holding Co. parcel that he listed as assemblage sale # 7 in his appraisal report. Judge Rimm rejected this listing because the land was in two zoning districts, RS-C, like defendant’s property, and the RM-4 district that does not allow casinos.
Defendant contends that Judge Rimm incorrectly rejected this listing because it is not in two zoning districts, and plaintiff agrees. However, plaintiff maintains that because the experts for both parties agreed that the minimum size for a casino site was five to seven acres and the A.C. Holding Co. site is only 2.24 acres, it was too small to be an independent casino site. Plaintiff adds that the site is separated by an entii-e block from the Hilton, the nearest hotel-casino, and that the President of the Hilton stated that it was on the opposite side of the Hilton from where the Hilton would expand, so it was not comparable to casino property.
Plaintiff adds that it was in use and ostensibly for sale as a parking lot on the assessment date and not as a casino site, so the listing at less than $82 per square foot could not have influenced Judge Rimm’s decision. This is because Judge Rimm concluded that the highest and best use of defendant’s property was for a casino, not a parking lot.
A judge may reject a property as a comparable solely because it has a different highest and best use. See, e.g., American Cyanamid Co. v. Wayne Township, supra, 17 N.J.Tax at 557 *190 (noting that because the building was sold for multi-tenant use, which was different from the highest and best use for the subject property, the price might not be reflective of the subject property’s value); Newport Ctr. v, City of Jersey City, supra, 17 N.J. Tax at 418-25 (excluding from evidence sales having highest and best uses so dissimilar to the highest and best use of the subject property as to render the sales of no assistance to the court in valuing the subject property). Indeed, the highest and best use “ ‘should be the same or similar for each comparable property as for the subject property.’” Id. at 419 (quoting The Appraisal Institute, The Appraisal of Real Estate 303 (11th ed.1996)).
We agree with plaintiff that the judge’s finding was harmless error. The critical issue to Judge Rimm was highest and best use; this site’s highest and best use was as a parking lot. We have no doubt that had Judge Rimm realized that the property was in only one zoning district, he would not have relied on the sale because of the difference in highest and best use.
Finally, defendant claims that Chaiken did not address or account for “wild variations in market conditions between the 1983-87 and 1993 time periods.” However, Chaiken did analyze the market data and made adjustments based on the year. He adjusted for this time difference by making a -20% adjustment to the Golden Nugget assemblage and a -30% adjustment to the Sands assemblage. We conclude that Judge Rimm did not abuse his discretion by relying on the Golden Nugget and Sands assemblages.
Defendant contends that Judge Rimm ignored the uncontrovert-ed facts concerning material changes in the casino market that had occurred over time when he concluded that there was “ample evidence from Mr. Chaiken in the record” concerning the nature of the market for casino-hotels in Atlantic City and how the market developed from 1978 to 1993. Defendant’s argument fails because there were two different opinions as to the casino market in 1993, and Judge Rimm relied on Chaiken’s opinion and not on Graziano’s.
*191 We need not recite the myriad of facts before Judge Rimm regarding the status of the casino industry in Atlantic City during the time period in question. It is apparent to us that, despite defendant’s argument, Judge Rimm had an excellent “feel” for and understanding of the unique nature of this market and industry. In sum, Judge Rimm considered the nature of the casino market in determining the value of defendant’s property. We conclude that the nature of the casino-hotel market was supported by the record, and Judge Rimm properly considered the evidence of change in market conditions.
Judge Rimm made thorough and precise findings of fact and conclusions of law demonstrating not only his understanding and sensitivity to the vicissitudes of the unique Atlantic City real estate market and the impact of the casino industry on such market, but also the expertise of the Tax Court in dealing with the complex issues presented here. In Ginnetti, another action involving the valuation of casino related property, Judge Rimm observed:
Before dealing with the specifies of the valuation issue, several observations must be made. The first is that, to quote from the case of City of Atlantic City v. Atlantic County Board of Taxation, 2 N.J.Tax 30 (Tax 1980), aff'd per curiam, 4 N.J.Tax 685 (App.Div.1982), certif. denied, 93 N.J. 250, 460 A.2d 659 (1983), “Atlantic City is unique. Of all of the 567 municipalities in the State of New Jersey, it is the only municipality mentioned by name in the State Constitution. New Jersey Constitution (1947) Art. IV, § VII, par. 2D. The financial well-being of the city is also of the utmost importance not only to the city itself and to its taxpayers but to the county, the region and to the entire state.” City of Atlantic City, supra, 2 N.J.Tax at 43.
This unique nature imposes on litigants, lawyers and on the Tax Court itself, difficult valuation issues. The real estate market in Atlantic City does not necessarily behave in the same manner as real estate markets behave in other localities.
Secondly, it is difficult to find comparable sales of property m Atlantic City, when valuing properties by the comparison sales approach, because of zoning considerations, proximity to existing casino-considerations, proximity to existing casino-hotels, the city infrastructure, and the broad spectrum of sellers and buyers who have participated in the real estate market in Atlantic City, as either developers or speculators, since the inception of gambling in 1978. Complicating all of this is the fact that Atlantic City suffered from the decline in the real estate market as a result of the savings and loan debacle, just as the rest of the country did. Therefore, in many instances, there is a dearth of comparable sales for valuing property in Atlantic City. Yet, I must use the information that has been presented to me by way of facts and expert opinion to ultimately fix the assessable *192 values of the subject properties. Consider for example, Cigolini Assocs. v. Fairview, 208 N.J.Super. 654, 665, 506 A.2d 811 (App.Div.1986), in which the court said, “[fjurlher, in deciding the case we recognize that in the absence of sales it may not be easy to determine the value of the units in the [subject property]. But we find that circumstance not be germane for it is not unusual for property which is difficult to value to be assessed. See, e.g., Hackensack Water Company v. Borough of Old Tappan, 77 N.J. 208, 390 A.2d 122 (1978).” I am also admonished by the Supreme Court to find value. Ford Motor Co. v. Township of Edison, 127 N.J. 290, 604 A.2d 580 (1992).
Ginnetti, supra, 17 N.J.Tax at 360-61 (1992)
These same observations apply here with equal force.
Lastly, we must again recognize the scope of review that applies in considering an appeal from a Tax Court determination. In Global Terminal & Container Service v. City of Jersey City, 15 N.J.Tax 698, 702-03 (App.Div.1996), we stated:
Judgments of a trial judge sitting without a jury “are considered binding on appeal when supported by adequate, substantial and credible evidence." Pascale v. Pascale, 113 N.J. 20, 33, 549 A.2d 782 (1988) (quoting Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484, 323 A.2d 495 (1974)). This is especially so with respect to the findings of the Tax Court because of the special expertise afforded to such courts. Kearny Leasing Corp. v. Town of Kearny, 7 N.J.Tax 665, 667 (App.Div.), certif. denied, 102 N.J. 340, 508 A.2d 215 (1985).
“Moreover, ‘[s]inee the judges assigned to the New Jersey Tax Court have special expertise, [this court] will not disturb their finding unless they are plainly arbitrary or there is a lack of substantial evidence to support them.’ ” Pine Street Management Corp. v. City of East Orange, 15 N.J.Tax 681, 686 (App.Div.1995), certif. denied, 144 N.J. 172, 675 A.2d 1121 (1996) (quoting G. & S. Co. v. Borough of Eatontown, 6 N.J.Tax, 218, 220 (App.Div.1982)). Applying these standards here, we find no basis to overturn the judgment of the Tax Court.
Affirmed.

 It appears that the appropriate adjustments for sale # 2 and sale # 5 were inadvertently transposed m Graziano's report.